MARTIN B. BRIFMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brifman v. Commissioner
Docket No. 868-90
United States Tax Court
T.C. Memo 1992-375; 1992 Tax Ct. Memo LEXIS 397; 64 T.C.M. (CCH) 3; July 2, 1992, Filed *397 Decision will be entered under Rule 155. P claimed losses from an investment in a multi-party equipment leasing transaction on his Federal income tax returns for the taxable years 1984, 1985, and 1986. R disallowed the claimed losses on the ground that P was not at risk under sec. 465(a), I.R.C., with respect to a particular debt obligation. Held, P effectively was protected against loss as described in sec. 465(b)(4), I.R.C., with respect to the debt obligation, and therefore P is not considered at risk under sec. 465(a), I.R.C.Thornock v. Commissioner, 94 T.C. 439 (1990), followed. Held, further, P is liable for the addition to tax under sec. 6661(a), I.R.C., and increased interest under sec. 6621(c), I.R.C.
Isaac W. Zisselman and Jack L. Hollander, for petitioner. Vincent J. Guiliano, for respondent. NIMS
NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in and additions to the Federal income tax liability of Martin B. Brifman (petitioner) as follows: Additions to tax -- Sections
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
6654
6661
1984
$ 13,128
$761.10
$ 1,316.05
[1]
$ 782.58
$ 3,805.50
1985
4,583
191.65
929.15
[1]
253.08 --    1986
5,416
242.85
1,022.05
[1]
598.50
1,214.25
*398 Respondent further determined that petitioner is subject to increased interest pursuant to section 6621(c) for each of the years in dispute. (Section references are to the Internal Revenue Code as amended and in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.) After concessions, the issues for decision are: (1) Whether petitioner was "at risk" within the meaning of section 465 with respect to a promissory note reflecting a portion of his investment in an equipment leasing transaction during the taxable years 1985 and 1986; (2) whether petitioner is liable for the additions to tax for negligence pursuant to section 6653(a) for the taxable years 1985 and 1986; (3) whether petitioner is liable for the addition to tax for substantial understatement of tax liability pursuant to section 6661(a) for the taxable year 1986; and (4) whether petitioner is liable for increased interest pursuant to section 6621(c) for the taxable years 1985 and 1986. FINDINGS OF FACT Some *399 of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Sacramento, California, at the time he filed his petition. During the years in issue, petitioner was an attorney admitted to practice law in the State of California. A. The First Tier Sale/Leaseback Transaction. On January 15, 1982, RCA American Communications, Inc. (RCA) launched a domestic communications satellite, Satcom IV, into orbit 22,300 miles above the earth. The satellite contains numerous transponders that are instrumental in processing signals that the satellite receives from antennae on earth. A transponder is a cigarette box-sized device that can transmit voice, data, and video from an orbiting satellite to almost any point within the United States. In August, 1982, American Broadcasting Companies, Inc. (ABC) acquired two of the transponders on Satcom IV from RCA for a purchase price of $ 13 million each, or a total price of $ 26 million. In May, 1983, ABC assigned all of its rights, benefits, responsibilities, and liabilities with respect to the two transponders to its wholly owned subsidiary, *400 ABC Video Enterprises, Inc. (ABC Video). By letter dated April 27, 1984, Integrated Resources Equipment Group, Inc. (IREG), submitted a proposal to ABC for the sale and leaseback of the transponders. IREG is a wholly owned subsidiary of Integrated Resources, Inc. (Integrated), a financial services company in the business of offering private investment programs. By letter dated September 17, 1984, IREG transmitted a confidential debt placement memorandum respecting the proposed sale and leaseback of the transponders to Nationwide Life Insurance Company (Nationwide). After reviewing the memorandum, Nationwide agreed to provide financing for the transaction according to the terms set forth in the memorandum. On October 30 and 31, 1984, Integrated Equipment Leasing Corp. (IELC), another wholly owned subsidiary of Integrated, acquired the two transponders from ABC Video for a purchase price of $ 9,774,701 each, or a total price of $ 19,549,402. This aspect of the transaction was documented through a bill of sale, an assignment of purchase agreement, and a so-called participation agreement. The participation agreement, identifying Nationwide as the lender, IELC as lessor, and ABC *401 Video as lessee, stated that ABC Video, with RCA's consent, assigned its rights in the transponders to IELC. To secure financing for the transaction, IELC entered into two identical loan and security agreements with Nationwide. Pursuant to the loan and security agreements, IELC gave Nationwide two nonrecourse notes of $ 8,601,736.88 each (one for each transponder) to be paid quarterly from October 31, 1984, through July 31, 1989. Two identical funding memoranda dated October 31, 1984, state in pertinent part: 1. The Lender will make the Loan * * * to the Lessor in the amount of $ 8,601,736.88, pursuant to the Participation Agreement; 2. The Lessor will transfer or cause the transfer of the sum of $ 9,774,701.00 (consisting of the Loan in the amount of $ 8,601,736.88 and the investment by the Lessor in the amount of $ 1,172,964.12) to the Lessee for the purchase of the Leased Equipment * * *. On or about October 31, 1984, IELC entered into identical lease agreements (one for each transponder) with ABC Video whereby IELC leased the transponders back to ABC Video for a period of five years. (These leases will hereinafter be referred to as the user leases.) Pursuant to the *402 user leases, ABC Video agreed to remit its quarterly rental payments directly to Nationwide in satisfaction of the amounts due to be paid to Nationwide under the IELC notes. ABC Video's rental payments approximately equaled in time and amount the payments owing to Nationwide under the IELC notes -- the rental payments were in fact applied in satisfaction of the IELC notes. Consistent with the terms of the user leases, ABC Video obtained insurance on the transponders to cover losses in the event the transponders should fail. On or about October 31, 1984, ABC agreed to unconditionally guarantee ABC Video's rental payments under the user leases. Nationwide relied upon the rental payments due from ABC Video under the user leases, ABC's guarantee with respect to those rental payments, and its own security interest in the transponders as the means for collecting on the IELC notes. B. The Second Tier Sale/Leaseback Transaction. On December 31, 1984, IELC sold the two transponders to Investors Credit Corp. (ICC), another wholly owned subsidiary of Integrated, for a total purchase price of $ 19,549,402. ICC paid the purchase price with $ 3,914,880 in cash and the balance in the *403 form of a promissory note payable to IELC in the amount of $ 15,634,522. ICC was obligated under its note to pay IELC $ 6,080 on December 31, 1984, and varying quarterly payments from January 1, 1985, through October 1, 1992. The ICC promissory note purports to be a recourse note. On the same day, ICC agreed to lease the transponders back to IELC for a period of eight years subject to the rights of ABC Video under the user leases. (The ICC/IELC lease will hereinafter be referred to as the master lease agreement.) Pursuant to the master lease agreement, IELC agreed to pay ICC fixed rent in the amount of $ 8,496 on December 31, 1984, and varying quarterly payments thereafter from January 1, 1985, through October 1, 1992. These fixed rental payments approximately equaled in time and amount the payments ICC owed IELC under the ICC note. The lease agreement also called for the payment of additional contingent rent by IELC to ICC in an amount equal to 51 percent of all "remarketing proceeds" following the expiration of the ABC Video user leases. On December 31, 1984, as an inducement for ICC to enter into the master lease agreement with IELC, Integrated agreed to unconditionally *404 guarantee IELC's rental payments under the master lease agreement. The agreement stated in pertinent part: 1. Guaranty. Guarantor [Integrated] hereby absolutely, unconditionally and irrevocably guarantees to Lessor [ICC] and its successors and assigns, the prompt and unconditional payment, when due, of Aggregate Rent payable by Lessee [IELC] under the Master Lease (the "Obligations"). 2. Continuing Obligation. The obligations of Guarantor hereunder are and shall be absolute and unconditional, continuing under any and all circumstances including, without limitation, circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor, it being further expressly agreed that the obligations of Guarantor hereunder shall not be discharged except by payment and/or performance as herein provided. * * * 9. Successors and Assigns. This Guaranty shall be binding upon Guarantor and its legal representatives, successors and assigns and shall inure to the benefit of and be enforceable by Lessor and its successors, transferees and assigns. Without limiting the generality of the foregoing, this Guaranty may be assigned, including as collateral *405 security, by Lessor, its successors or assigns, in connection with the assignment by Lessor, its successors or assigns, of the Master Lease or any right to receive payment thereunder (including assignment by way of contribution to a trust); any such assignee of this Guaranty shall succeed to and shall have the right to exercise, upon the terms set forth herein, all of the rights and remedies of Lessor hereunder as if originally named Lessor herein. On the same day, IELC entered into a collateral assignment agreement with ICC whereby IELC assigned its obligations under the master lease agreement to ICC. C. Satellite Equipment Trust A. On December 31, 1984, ICC formed Satellite Equipment Trust A (trust) as a grantor trust with ICC as initial beneficiary and the J. Henry Schroder Bank & Trust Co. as trustee. On the same day, ICC transferred the transponders to the trust and assigned all of its rights and liabilities in the transponders to the trust. Pursuant to a confidential memorandum released prior to the actual formation of the trust, 40 units of beneficial interest in the trust were offered for sale to private investors at a price of $ 105,582 in cash plus an installment *406 promissory note payable to ICC in the amount of $ 390,988. As an alternative to paying the full $ 105,582 amount in cash, each investor was given the option of executing a second installment promissory note in an amount up to $ 86,936 per unit with First Equipment Credit Corp. (FECC), another wholly owned subsidiary of Integrated. Prior to investing in the trust, petitioner completed an investor questionnaire. In the questionnaire, petitioner identified William Murray, a certified public accountant, as his advisor with respect to the investment. Petitioner acquired a one-half unit of beneficial interest in the trust by paying $ 9,323 in cash to ICC and issuing promissory notes to FECC and ICC in the amounts of $ 43,467 and $ 195,494, respectively. In addition, petitioner granted both ICC and FECC security interests in his beneficial interest in the trust. Petitioner's promissory note to ICC, purportedly recourse, required that petitioner pay ICC quarterly principal and interest payments in varying amounts from January 1, 1985, through October 1, 1992. These quarterly payments approximately equaled in time and amount petitioner's pro rata share of the quarterly rental payments *407 due to be paid by IELC to the trust under the master lease agreement. In this regard, the fixed rental payments received by the trust under the master lease agreement have in fact been applied in satisfaction of the payments due under petitioner's promissory note to ICC. Pursuant to the promissory note in favor of FECC, petitioner promised to pay FECC four principal and interest payments in varying amounts by March 15 for the years 1985 through 1988. D. Subsequent Events. On August 8, 1989 (in apparent anticipation of the expiration of the ABC Video user leases), IELC entered into a lease agreement with Viacom International, Inc. (Viacom), whereby IELC leased one of the transponders to Viacom for the period from November 1, 1989, to the earlier of December 31, 1992, or the date the transponder ceases to function. Under the lease, Viacom agreed to pay IELC a total monthly rental fee of $ 110,000. On February 13, 1990, Integrated filed a petition with the United States Bankruptcy Court for the Southern District of New York seeking protection from its creditors under Chapter 11 of the United States Bankruptcy Code. On April 1, 1990, IELC entered into a lease agreement with *408 Rainbow Network Communications (Rainbow) whereby IELC leased the second transponder to Rainbow from that date until the date the transponder ceases to function. Rainbow agreed to pay IELC a total monthly rental fee of $ 95,000. For the taxable years 1984, 1985, and 1986, petitioner claimed loss deductions with respect to his investment in the trust in the amounts of $ 36,655, $ 16,193, and $ 13,193, respectively. By notice of deficiency dated October 10, 1989, respondent determined deficiencies in, increased interest, and additions to petitioner's Federal income tax liability for the taxable years at issue on the ground that petitioner was not at risk under section 465 with respect to his beneficiary note to ICC in the amount of $ 195,494. Respondent now concedes that petitioner was at risk to the extent of $ 52,791 during the years in dispute reflecting the cash that petitioner paid to ICC as well as the note that petitioner gave to FECC. Because this amount exceeds the loss that petitioner claimed for the taxable year 1984, respondent agrees that petitioner is not liable for the deficiency, additions to tax, or increased interest as set forth in the deficiency notice for that *409 taxable year. OPINION The "at risk" rules set forth in section 465 limit the amount of losses that a taxpayer may claim from certain activities. For purposes of the instant case, section 465 provides that losses arising from the leasing of depreciable property are allowed only to the extent that the taxpayer is financially at risk with respect to the activity. Sec. 465(a)(1) and (c)(1)(C); Levy v. Commissioner, 91 T.C. 838, 862 (1988). Section 465 is applied on the basis of the facts existing at the end of each taxable year. Capek v. Commissioner, 86 T.C. 14, 48 (1986). A taxpayer generally is considered to be financially at risk to the extent he contributes money to the activity. Sec. 465(b)(1)(A). In addition, a taxpayer generally is considered to be at risk with respect to amounts borrowed for use in an activity to the extent that he is ultimately financially responsible for the debt obligation. Sec. 465(b)(1)(B) and (b)(2). It is appropriate to take into account the substance and realities of the financing arrangement presented to us. Melvin v. Commissioner, 88 T.C. 63, 75 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990). *410 The "economic reality" of the situation is the key factor in determining who is ultimately liable for a debt. Melvin v. Commissioner, 894 F.2d at 1075. In this regard, section 465 contains express exceptions to the general rule that borrowed amounts are considered at risk. In particular, section 465(b)(3) and (4) provides in pertinent part: (3) CERTAIN BORROWED AMOUNTS EXCLUDED. -- (A) IN GENERAL. -- Except to the extent provided in regulations, for purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who has an interest in such activity or from a related person to a person (other than the taxpayer) having such an interest. (B) EXCEPTIONS. -- (i) INTEREST AS CREDITOR. -- Subparagraph (A) shall not apply to an interest as a creditor in the activity. * * * (4) EXCEPTION. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. In sum, section 465(b)(3) provides that *411 amounts borrowed from any person who has an interest (other than a creditor) in an activity or from a person related to a person having such an interest are not considered at risk. On the other hand, section 465(b)(4) provides that even though a taxpayer nominally may be personally liable with respect to a debt obligation, for tax purposes such person will not be considered at risk for the debt obligation if protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Thornock v. Commissioner, 94 T.C. 439, 448 (1990). The legislative history of section 465(b)(4) indicates that the phrase "other similar arrangements" concerns situations where a taxpayer is effectively immunized from any realistic possibility of suffering an economic loss if the underlying transaction turns out unprofitable. Moser v. Commissioner, 914 F.2d 1040, 1048 (8th Cir. 1990), affg. T.C. Memo. 1989-142; American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990); Levy v. Commissioner, supra at 863-864; Larsen v. Commissioner, 89 T.C. 1229, 1272 (1987), *412 affd. in part, revd. in part 909 F.2d 1360 (9th Cir. 1990). Respondent takes the position that petitioner is not personally liable on his note to ICC as required for at risk treatment under section 465(b)(1)(B) and (b)(2). Respondent contends that even if petitioner is considered to be nominally personally liable with respect to the note, petitioner nevertheless is not at risk within the meaning of section 465 because petitioner is effectively protected against loss on the note under subsection (b)(4). In support of these arguments, respondent points to a combination of factors including: (1) The nonrecourse nature of IELC's debt obligations to Nationwide; (2) the offsetting rental and note payments under both tiers of the transaction; and (3) the rental guarantees applicable with respect to both the user and master leases. Respondent contends that the transaction in dispute is virtually indistinguishable from the transaction at issue in Thornock v. Commissioner, supra.
Petitioner counters that section 465(b)(4) does not apply under the particular facts of this case and that the leasing transactions in the cases relied upon by respondent *413 are distinguishable. Relying on Brady v. Commissioner, T.C. Memo. 1990-626, and Emershaw v. Commissioner, T.C. Memo. 1990-246, affd. 949 F.2d 841 (6th Cir. 1991), petitioner contends that the rental guarantees of ABC and Integrated do not protect petitioner against loss. In petitioner's view, Integrated's guarantee of IELC's rental payments merely enhanced IELC's credit standing. Petitioner cites Gefen v. Commissioner, 87 T.C. 1471, 1503 (1986), for the propositions that: (1) There is no requirement that a taxpayer must enter into a transaction with a high credit risk in order to be considered at risk in the general sense under section 465; and (2) the mere fact that a taxpayer has entered into a transaction with an entity posing a low credit risk does not lead to the conclusion that the taxpayer is protected against loss under section 465(b)(4). Petitioner further contends that respondent's analysis is flawed on the grounds that: 1. The IELC Notes matured on July 31, 1989, while the Beneficiary Note would not be fully paid until October 31, 1992 * * *. 2. A disposition by Integrated of its shares *414 in ICC at any time would not constitute a breach by Integrated of any of its obligations to petitioner or Trust A nor was ICC restricted in its ability to sell or otherwise dispose of the ICC Notes. 3. Integrated's bankruptcy filing on February 13, 1990 clearly indicates the fallacy of respondent's reasoning regarding the protection afforded to petitioner as a result of Integrated's guarantee of IELC's obligation * * *. With respect to the latter point, petitioner maintains that Integrated's bankruptcy in 1990 "is a material factor in assessing petitioner's ultimate potential liability on his Beneficiary Note." In Thornock v. Commissioner, supra at 449, we concluded that in applying section 465(b)(4) it is both appropriate and incumbent on us to take into account the substance and the commercial realities of the financing arrangements presented to us by each transaction. In this respect, economic reality, not the forms and labels used by the participants, is controlling. Moser v. Commissioner, 914 F.2d at 1048; see Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991). *415 In Thornock, we emphasized that: although equipment leasing transactions (that are economically sound and that are not sham transactions) appear to be a type of tax-oriented transaction that Congress intended to encourage, the significant tax-oriented aspects of such transactions require that the availability of the tax benefits be determined by the true underlying economic substance of the transactions and not by features of the transactions that are mere window dressing and that serve no economic purpose. [Thornock v. Commissioner, supra at 450; fn. ref. omitted.] We agree with respondent that the equipment leasing transaction disputed herein is comparable to and shares many of the features of the transaction in question in Thornock. Moreover, based on our understanding of the entire transaction, we are compelled to conclude that petitioner was effectively protected against loss within the meaning of section 465(b)(4) with regard to his debt obligation to ICC. To discern the underlying economic substance of the transaction in dispute, it is necessary to focus on its various individual features. We begin by observing that Nationwide financed *416 the first tier sale and leaseback transaction between ABC Video and IELC on a nonrecourse basis. In particular, Nationwide relied exclusively upon the ABC Video rental payments due under the user leases, ABC's guarantee with respect to those rental payments, and its own security interest in the transponders as the means for collecting on the IELC notes. Notably, neither Integrated nor any of its subsidiaries involved in the second tier transaction (ICC or FECC) had any legal obligation or liability with respect to the Nationwide loan to IELC. As we see it, Nationwide (like Citicorp Credit in Thornock) was the ultimate creditor with respect to the leased equipment. Further, as was the case in Thornock, the transaction was structured with offsetting lease and note payments in combination with an unconditional rental guarantee between related parties. Considered separately, these features are not particularly compelling for purposes of applying section 465(b)(4). Nevertheless, when considered in light of the transaction as a whole, both features bear prominently on the question of whether petitioner was protected against loss with respect to his debt obligation to ICC. *417 We have found that IELC's rental payments due to be paid to petitioner as an investor in Trust A were sufficient, and were in fact applied, to offset the amounts due under petitioner's note to ICC. By virtue of this circular arrangement, it appears that the rental and note payments were satisfied through offsetting bookkeeping entries. In conjunction with the foregoing, we find it significant that as a consequence of ICC's transfer of the transponders to Trust A, Integrated's unconditional rental guarantee ran directly to petitioner in his capacity as an owner of a beneficial interest in Trust A. Consequently, if IELC failed to satisfy its rental obligations, petitioner was entitled to demand those payments directly from Integrated (IELC's and ICC's common parent). Petitioner relies on Gefen v. Commissioner, supra at 1501-1503, for the proposition that offsetting rental and note payments generally will not disqualify debt obligations for purposes of the at risk rules. While petitioner correctly states the general rule respecting such offsetting payments, we nevertheless have held that such arrangements are significant when it is evident that no party is *418 in a position to enforce the taxpayer's note. See Thornock v. Commissioner, 94 T.C. at 453; Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). As discussed more fully below, it does not appear that ICC would have any reason or incentive to enforce petitioner's note. Petitioner likewise argues that Integrated's rental guarantee is not particularly relevant to the at risk analysis because the guarantee was merely intended to enhance IELC's credit standing. Although IELC's credit standing may have been enhanced as a consequence of Integrated's guarantee, the fact remains that the guarantee was extended to petitioner as a beneficial owner in Trust A. In this light, we cannot agree that the guarantee is to be ignored for purposes of determining whether petitioner was protected against loss with respect to his debt obligation to ICC. Consistent with Thornock, we conclude that the combination of Nationwide's extension of nonrecourse financing at the first tier of the transaction, the offsetting nature of the rental and note payments, and Integrated's unconditional rental guarantee had the effect *419 of protecting petitioner against loss if the transaction turned out unprofitable. In short, these features of the transaction seem to eliminate any incentive to enforce petitioner's note. Again, the transaction was structured so that the rental payments that petitioner was entitled to receive from IELC would be applied to offset the amounts due under petitioner's note to ICC. As we see it, so long as IELC continued to satisfy its rental obligation, there would never be any need for petitioner to be called upon to make payments on his note to ICC. Moreover, if IELC ever defaulted on its rental payments, petitioner would have the right to enforce Integrated's unconditional guarantee to make the payments on IELC's behalf. In our view, if Integrated were to refuse to honor its guarantee respecting the rental payments, petitioner would have an effective defense to any further payments on his debt obligation to ICC. Thornock v. Commissioner, supra at 451-452. Under these circumstances, we consider petitioner's purportedly recourse debt obligation to be merely window dressing fashioned to satisfy section 465 in form only. Petitioner's argument regarding the *420 differing maturation dates of the IELC notes (July 31, 1989) and petitioner's note (October 1, 1992) is inapposite. In short, because Nationwide extended credit to IELC at the first stage of the transaction on a nonrecourse basis, it is evident that petitioner was not at risk with respect to those obligations. Thus, the maturation date of the IELC notes is irrelevant to our analysis. Similarly, we fail to see the significance of petitioner's assertion that Integrated could have disposed of its shares in ICC at any time without breaching its obligations to petitioner or Trust A. As previously indicated, section 465 is applied on the basis of the facts existing at the end of each taxable year. Capek v. Commissioner, 86 T.C. 14, 48 (1986). Because Integrated did not dispose of its interest in ICC during the years in issue, we see no merit in considering the impact that such a hypothetical disposition might have on our analysis. Petitioner further contends that Integrated's 1990 bankruptcy demonstrates that Integrated's rental guarantee was not effective to protect petitioner against loss with respect to his debt obligation to ICC. We disagree. The legislative *421 history of section 465 (quoted in Capek v. Commissioner, supra at 53) states that it is to be assumed that the amounts due under a loss protection guarantee will be fully paid unless and until the taxpayer becomes unconditionally entitled to payment and at that time demonstrates that he cannot recover under the agreement. See S. Rept. 94-938 at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88. With the foregoing legislative history as background, we have repeatedly held that "the potential bankruptcy of entities providing guarantees or loss protection to investors is not a consideration in determining the application of section 465(b)(4) unless and until the bankruptcy actually occurs." Thornock v. Commissioner, supra at 454; Capek v. Commissioner, supra at 52-53. Accord American Principals Leasing Corp. v. United States, 904 F.2d at 483. Because there is no indication in the record that petitioner was ever required to enforce or attempt to enforce the Integrated guarantee or that Integrated refused to honor its obligation, Integrated's bankruptcy is immaterial to the question *422 of whether petitioner was at risk during the taxable years before the Court. In sum, petitioner effectively was protected against loss with respect to his promissory note to ICC. Pursuant to section 465(b)(4), it follows that petitioner is not considered to be at risk for the amount of the note, and we so hold. Additions to Tax and Increased Interest. Respondent determined that petitioner is liable for additions to tax for negligence pursuant to section 6653(a). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner contends that he is not liable for the addition to tax for negligence because he exercised extreme care prior to investing in Trust A. In particular, petitioner contends that he consulted with his accountant concerning the investment and reviewed the offering memorandum in detail prior to purchasing his beneficial interest. Respondent's determination of negligence is presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), *423 affg. T.C. Memo. 1982-337; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Under the circumstances, we conclude that petitioner exercised due care prior to investing in the trust. Specifically, we are persuaded that petitioner consulted with his accountant prior to investing in the trust and reviewed the offering memorandum in detail. Respondent further determined that petitioner is liable for the addition to tax pursuant to section 6661(a). With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any substantial understatement of income tax. The amount of the understatement is computed in accordance with section 6661(b)(2)(B) and (C). The amount of understatement is reduced if there is substantial authority for the tax treatment of the item at issue (section 6661(b)(2)(B)(i)) or if the relevant facts affecting the item's tax treatment are adequately disclosed (section 6661(b)(2)(B)(ii)). In the case of "tax shelters", the reduction for adequate factual disclosure does not apply, and the reduction for substantial authority applies only where the taxpayer reasonably believed that the tax treatment *424 was more likely than not proper. Marine v. Commissioner, 92 T.C. 958, 993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Petitioner bears the burden of proof on this issue. Rule 142(a). Nevertheless, petitioner does not address any of the criteria for reduction of the section 6661 addition, i.e., the existence of substantial authority, the matter of adequate disclosure, or the question of "reasonable belief" vis-a-vis tax shelters. On the contrary, petitioner simply relies upon the blanket statement that "all amounts claimed by the petitioner on the applicable tax returns were proper." In his reply brief, petitioner simply does not respond to respondent's arguments in support of her section 6661 determination. For the foregoing reasons, if the parties' computations under Rule 155 demonstrate that a substantial understatement exists, respondent's determination is sustained. Respondent also determined that petitioner is subject to increased interest pursuant to section 6621(c). Section 6621(c)(1) provides for an increased interest rate on any substantial underpayment attributable to a tax motivated transaction. Section *425 6621(c)(2) defines a "substantial underpayment" as any underpayment of income tax attributable to one or more tax motivated transactions if the resulting amount of the underpayment for that year exceeds $ 1,000. Section 6621(c)(3)(A)(ii) includes within the list of transactions that are deemed "tax motivated" any loss disallowed by reason of section 465(a). In Peters v. Commissioner, 89 T.C. 423, 444 (1987), and Larsen v. Commissioner, 89 T.C. 1229, 1279 (1987), affd. in part, revd. in part 909 F.2d 1360 (9th Cir. 1990), we sustained respondent's determination of increased interest where the deficiencies arose from disallowed losses under section 465(a). In the instant case, we have sustained respondent's deficiency determinations on the ground that petitioner was not at risk under section 465(a). Accordingly, assuming there are substantial underpayments for the taxable years remaining in dispute, it necessarily follows that petitioner is liable for increased interest pursuant to section 6621(c). To reflect the foregoing, as well as the parties' concessions, Decision will be entered under *426 Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency. The additions to tax for negligence for the taxable year 1986 are codified under sec. 6653(a)(1)(A) and (B)↩.