**UNITED STATES of America, Plaintiff,**

v.

**James H. TUFF and Rhonda Robertson Tuff, Defendants.**

No. C04–570Z.

United States District Court, W.D. Washington, At Seattle.

Feb. 4, 2005.

**1130**

Robert Patrick Brouillard, U.S. Attorney's Office, Seattle, WA, W. Carl Hankla, U.S. Department of Justice, Washington, DC, for Plaintiff.

Brian Gary Isaacson, Isaacson Law Firm, Duncan Calvert Turner, Don Paul Badgley, Badgley Mullins Law Group, Seattle, WA, for Defendants.

## ORDER

ZILLY, District Judge.

This case comes before the Court on the Defendants' first motion for summary judgment, docket no. 11, Plaintiff's motion for summary judgment, docket no. 32, and Defendants' second motion for summary judgment, docket no. 35. The Court, having considered the briefs in support and opposition to the motions, hereby DENIES Defendants' first and second motions for summary judgment and GRANTS Plaintiff's motion for summary judgment.

*PROCEDURAL BACKGROUND*

On or about April 15, 2000, James H. Tuff and Rhonda Roberston Tuff, his wife, (together "Defendants"), filed a Form 1040 for 1999 reporting Form W–2 income from RealNetworks Corporation ("RealNetworks") in the amount of $540,543. Hankla Decl., docket no. 33, Ex. 17.[1] On or about January 3, 2002, Defendants filed a Form 1040X amended return/claim for refund. Tuff Decl., docket no. 12, Ex. A. The amended claim listed Mr. Tuff's W–2 income as $86,586, a difference of $453,957 from the original return. *Id.*, Ex. A at JHT00267. Based on this difference, the Defendants claimed a tax refund in the amount of $179,135 plus statutory interest. *Id.*, Ex. A at JHT000234. On or about March 18, 2002 the Internal Revenue Service ("IRS") allowed the Defendants refund claim and issued a check for $208,513.20. The United States now claims that the IRS refund to Defendants was erroneous and seeks a judgment against Defendants in the amount of $208,513.20 plus statutory interest. Complaint, docket no. 1.

---

1. Because Washington is a community property state, Mrs. Tuff would presumably have an interest in one-half of the value of the stock options and the shares. Therefore, throughout the discussion portion of this order, the Court refers to the Defendants as the owners of the shares at issue.

## FACTUAL BACKGROUND

Defendant James H. Tuff was an employee of RealNetworks at all times relevant. Tuff Decl., docket no. 12, ¶ 3. Mr. Tuff was classified as a corporate insider at RealNetworks. *Id.* ¶ 4. As such, Mr. Tuff could only sell shares in RealNetworks during open trading widows which were approved by RealNetworks. *Id.*

As part of Mr. Tuff's compensation package, he received grants of nonqualified stock options from RealNetworks. *Id.* ¶ 5; Hankla Decl., docket no. 33, Exs. 2 and 3. On March 8, 1999 and April 18, 1999, Mr. Tuff exercised options on shares with a total market value of $460,093.75.[2] Hankla Decl., Exs. 8, 9 and 13; Tuff Decl., Ex. C at JHT 001481–483. The total exercise price of these shares was $6,137, making the difference, or spread, between the total market value of the shares and the exercise price $453,956.75. Hankla Decl., Exs. 8, 9 and 13; Tuff Decl., Ex. C at JHT 001481–483.

Mr. Tuff used a margin loan from Morgan Stanley to exercise these shares. Tuff Decl., ¶ 6, Ex. C. Mr. Tuff wrote two checks to RealNetworks on his Morgan Stanley margin loan account to cover the strike price and the withholding taxes on each exercise of shares. Hankla Decl., Exs. 7 and 12. The margin loan was governed by a "Client Account Agreement" (the "Agreement"). Hankla Decl., Ex. 4. Under the terms of the Agreement, "margin privileges involve the extension of credit by Dean Witter Reynolds to you, secured by the collateral in your account and the amount borrowed will appear as a debit balance on which you will be charged interest ...." *Id.,* Ex. 4, p. 7.[3] Mr. Tuff used the shares he received after exercising his options as collateral for this loan. Tuff Decl., ¶ 6. Under the terms of the Agreement, Morgan Stanley had the right to liquidate Mr. Tuff's shares if and when necessary to maintain adequate collateral in Mr. Tuff's account. Hankla Decl., Ex. 4, pp. 7–8. Morgan Stanley could sell these shares pursuant to a "margin call." A margin call occurs when a broker asks a client for additional funds when the equity in the client's account falls below a certain level. *Id.,* Ex. 22. The broker usually gives the client a few days to produce the additional funds and if the client fails to do so, the broker sells some of the client's stock to satisfy the margin call. *Id.* Additionally, according to the Agreement, Mr. Tuff "agree[d] at all times to maintain such margins for [his] account with Dean Witter Reynolds as required by law or custom, or as we may deem necessary or advisable. [He] also promise[d] to discharge [his] obligations to Dean Witter Reynolds upon demand: this obligation survive[d] termination of [his] account with Dean Witter Reynolds." *Id.,* Ex. 4, p. 7.

In 1999, Morgan Stanley liquidated 2,200 of Defendants' shares of RealNetworks in order to satisfy margin calls. Tuff Decl., Ex. H. 1,200 of these shares were liquidated during blackout periods, when Mr. Tuff was precluded from trading RealNetworks shares because he was a RealNetworks insider. *Id.,* Ex. G, Ex. H.

---

2. The confirmation of exercise forms provided by the Plaintiff and Defendants for 1999 differ. *See* Hankla Decl., Exs. 8, 9, 13; Defs.' Motion for Summary Judgment, Ex. A at JHT001481–001483. The difference appears to be due to two RealNetworks stock splits which occurred in 1999 and 2000. These disparities only result in a net difference in the spread calculated of $10.75. *See id.* The Court adopts the numbers submitted by the Plaintiff, as the date these confirmation of exercise forms were printed was in 1999, prior to any stock split.

3. Although the agreement refers to Dean Witter Reynolds, Mr. Tuff's account was with Morgan Stanley Dean Witter & Co. and certain services were offered to him through Dean Witter Reynolds Inc. Hankla Decl., Ex. 4.

## DISCUSSION

### I. Cross–Motions for Summary Judgment

This matter now comes before the Court on cross-motions for summary judgment. Summary judgment is appropriate when the movant demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the moving party meets its initial responsibility, the burden shifts to the non-moving party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must present significant probative evidence tending to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991). Evidence submitted by a party opposing summary judgment is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On cross-motions for summary judgment, the Court must consider each party's motion separately and determine whether that party is entitled to a judgment under Rule 56. *W. Land Exch. Project v. United States BLM,* 315 F.Supp.2d 1068, 1075 (D.Nev.2004). In making these determinations, the Court must evaluate the evidence offered in support of each cross-motion, *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir.2001), and must consider the motion with all reasonable inferences favoring the non-moving party. *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1111, 1117 (9th Cir.2001).

### 2. Defendants' First Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment

■ In their first motion for summary judgment, docket no. 11, Defendants argue that the IRS did not err in refunding the tax they paid on the value of the RealNetworks shares at the time of exercise, because the shares were not taxable at the time of exercise. Instead, Defendants argue that the shares were taxable at the time they were sold to satisfy Morgan Stanley margin calls. In its cross-motion for summary judgment, docket no. 32, Plaintiff argues that the shares were taxable at the time of exercise, not when they were sold.

Two recent district court decisions, one published and one unpublished, have considered issues identical to many now before the Court. In both *Miller v. United States,* 345 F.Supp.2d 1046 (N.D.Cal.2004) and *Facq v. United States,* C03–3851, 95 A.F.T.R.2d 2005-1290 (W.D.Wash. Jan. 6, 2005), the courts rejected arguments identical to those now advanced by Defendants that their RealNetworks shares were not taxable at the time of exercise. In addition, the bankruptcy court in this District reached the same result in *In re Espejo,* No. 03–17114, 95 A.F.T.R.2d 2005-1407 (Bankr.W.D.Wash. Nov. 16, 2004) and that opinion has now been affirmed by this Court in *In re Espejo,* C04–2411Z, 95

A.F.T.R.2d 2005-1406 (W.D.Wash. Feb. 2, 2005). The Court agrees with the decisions reached in these cases and GRANTS the Plaintiff's motion for summary judgment and DENIES the Defendants' first motion for summary judgment.

### A. *Law Governing the Taxation of Stock Options*

Both parties agree that I.R.C. § 83 governs the issue of when the Defendants' acquisition of the RealNetworks shares were taxable. I.R.C. § 83 states in part:

> If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of:
>
> (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
>
> (2) the amount (if any) paid for such property,
>
> shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

Therefore, a taxable event occurs when property, in this case shares of RealNetworks, is transferred to the employee and when the employee's rights in that property become transferable or not subject to a substantial risk of forfeiture, whichever comes first.

### B. *The RealNetworks Shares were Transferred on the Date of Exercise*

Property is transferred when a person acquires a beneficial ownership interest in such property. Treas. Reg. § 1.83–3(a). In this case, the shares of RealNetworks were transferred to the Defendants on the date of exercise because Defendants had a beneficial ownership interest in such property. Defendants used at least some of the RealNetworks shares as collateral against their Morgan Stanley margin account. Using this collateral, Defendants made payments to their credit card company, paid the IRS back taxes, and paid for repairs on their home, among other uses. Hankla Decl., Exs. 15, 16.[4]

Despite the fact that they were the beneficial owners of the shares on the date of exercise, Defendants argue that no transfer occurred when they exercised their stock options. Defendants argue that because they did not risk their own collateral in obtaining the shares, their acquisition of the shares should be treated as an option to purchase them, not as a transfer.[5] Defendants rely on Treas. Reg. § 1.83–3(a)(2). Treas. Reg. § 1.83–3(a)(2) states:

> The grant of an option to purchase certain property does not constitute a transfer of such property.... In addition, if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance

---

4. As in *Miller*, 345 F.Supp.2d 1046, 1048 (N.D.Cal.2004), Defendants also had the right to receive any dividends and, absent certain circumstances not present here, to vote the stock. Hankla Decl., Ex. 4 (Client Account Agreement, p. 7); Ex. 15.

5. This argument was rejected in both *Miller v. United States*, 345 F.Supp.2d 1046 (N.D.Cal. 2004) and *Facq v. United States*, C03–3851C, 95 A.F.T.R.2d 2005-1290 (W.D.Wash. Jan. 6, 2005).

the same as the grant of an option. The determination of the substance of the transaction shall be based upon all the facts and circumstances. The factors to be taken into account include the type of property involved, the extent to which the risk that the property will decline in value has been transferred, and the likelihood that the purchase price will, in fact, be paid.

According to Defendants, Treas. Reg. § 1.83–3(a)(7) Example 2 ("Example 2"), which applies the above regulation, governs the outcome of this case. This example states;

On November 17, 1972, W sells to E 100 shares of stock in W corporation with a fair market value of $10,000 in exchange for a $10,000 note without personal liability. The note requires E to make yearly payments of $2,000 commencing in 1973. E collects the dividends, votes the stock and pays the interest on the note. However, he makes no payments toward the face amount of the note. Because E has no personal liability on the note, and since E is making no payments towards the face amount of the note, the likelihood of E paying the full purchase price is in substantial doubt. As a result E has not incurred the risks of a beneficial owner that the value of the stock will decline. Therefore, no transfer of the stock has occurred on November 17, 1972, but an option to purchase the stock has been granted to E.

Treas. Reg. § 1.83–3(a)(7). Defendants argue that the facts of Example 2 are indistinguishable from the facts in this case. However, the Defendants reliance on Example 2 is misplaced. Unlike in Example 2, the purchase price of the shares was paid in full to RealNetworks by checks written by Mr. Tuff on his Morgan Stanley margin account. Hankla Decl., Exs. 7 and 12. Further, unlike the facts in Example 2, Mr. Tuff had assumed a risk that the RealNetworks shares he obtained would decline in value. Defendants advance several arguments that they, like E in Example 2, had "no personal liability," on the amount advanced by Morgan Stanley to purchase the shares and pay the withholding taxes. Defendants cite I.R.C. § 465(b)(4)'s use of the term "at risk" and decisions interpreting this regulation to argue that they were not "at risk" for the purchase price of the RealNetworks shares. However, as the court in *Facq v. United States* noted, I.R.C. § 465(b)(4) is in a section of the Internal Revenue Code governing tax deductions, not taxable income, which is at issue in this case. Additionally, the section specifically refers to the confines of § 465(b)(4), "[n]otwithstanding any other provision of this section ...." Further, Defendants provide no authority to support their main conclusion that I.R.C. § 465(b)(4)'s use of the term of "at risk" should be applied to Example 2's use of the term "no personal liability" for purposes of calculating taxable income.[6]

---

**6.** In fact, all of the legal authority cited applies the term "at risk" in the context of claiming deductions. *See Whitmire v. Comm'r,* 178 F.3d 1050 (9th Cir.1999) (analyzing term "at risk" for purposes of claiming deduction); *American Principals Leasing Corp. v. United States,* 904 F.2d 477, 479 (9th Cir.1990) (same); *Casebeer v. Comm'r,* 909 F.2d 1360, 1369 (9th Cir.1990) (same); *Melvin v. Comm'r,* 894 F.2d 1072 (9th Cir.1990) (same); *Pritchett, et al v. Comm'r,* 827 F.2d 644 (9th Cir.1987) (same); *Waters v. Comm'r,* 978 F.2d 1310 (2d Cir.1992) (same); *Young v. Comm'r,* 926 F.2d 1083, 1088 (11th Cir.1991) (same); *Moser v. Comm'r,* 914 F.2d 1040, 1048 (8th Cir.1990) (same); *Whitmire v. Comm'r,* 109 T.C. No. 13 (1997) (same); *Thornock v. Comm'r,* 94 T.C. 439, 448–49, 1990 WL 28024 (1990) (same); *Brifman v. Comm'r,* 64 T.C.M. (CCH) 3 (1992) (same); *Porreca v. Comm'r,* 86 T.C. 821, 838, 1986 WL 22123 (1986) (same); *Capek et al. v. Comm'r,* 86 T.C. 14, 1986 WL 22073 (1986) (same).

I.R.C. § 465(b)(4) is not relevant to the case at bar, which concerns taxable income. *See Facq v. United States,* C03–3851C, 95 A.F.T.R.2d 2005-1290 *4–5 (W.D.Wash. Jan. 6, 2005).

Defendants also argue that the structure of the Morgan Stanley margin loan, in that it was subject to a regulatory stop-loss provision, protected Defendants from personal liability for any deficiency should the shares have declined in value. While Defendants acknowledge that there is language in the Agreement making them liable for a deficiency in the event that the collateral was insufficient to satisfy the margin debt, Defendants argue that the stop-loss protection provided by the Morgan Stanley margin call requirements ensured that the loan was non-recourse. Defs.' First Motion, p. 23.

Defendants do not provide admissible evidence of the structure of the Morgan Stanley margin loan. Defendants rely on the fact that if the value of the loan collateral dropped below 1.333% of the purchase price of the collateral, Morgan Stanley was required to institute a margin call. *See* Defs.' First Motion, pp. 5. The only evidence Defendants provide of this requirement are Mr. Tuff's conclusory statements which lack personal knowledge. Tuff Decl., ¶ 7. There is no provision in the loan agreement provided to the Court by Defendants that had the value of the loan collateral dropped below the debt balance multiplied by 1.333%, Morgan Stanley was required to liquidate Defendants' shares. See Tuff Decl., Ex. D (Morgan Stanley Online: Important Information).[7]

■ Defendants also argue that "Regulation T" under securities law in combination with 17 C.F.R. § 240.15c3–1(a)(6)(iv) operated as a stop-loss order

that protected them against any risk of personal liability. Under Regulation T, 12 C.F.R. § 220.3(e)(4), in lieu of securities a creditor may accept a properly executed exercise notice and instructions to the issuer of the securities to deliver them to the creditor to temporarily finance a customer's receipt of securities pursuant to an employee benefit plan. This arrangement allows the creditor to sell the debtor's shares to ensure there is adequate collateral to secure the debt. Under 17 C.F.R. § 240.15c3–1(a)(6)(iv), brokers or dealers carrying a "market maker" account shall mark the account to the market not less than daily and shall issue appropriate calls for additional equity which shall be met by noon of the following business day. Both parties agree that Morgan Stanley was a market maker. Defendants argue that because Morgan Stanley was a market maker, it had to ensure on a daily basis that there was appropriate collateral in Defendants' account. Plaintiff argues that 17 C.F.R. § 240.15c3–1(a)(6)(iv) applies to brokers or dealers holding the accounts of market makers, not to market makers holding the accounts of customers like Defendants. Pltf.'s Motion, docket no. 32, pp. 18–19. Further, Plaintiff argues that Regulation T does not impose a duty on stock brokers to sell their customers' stock if it drops in value and margin requirements are no longer met. *Id.,* pp. 19–20. Indeed, 17 C.F.R. § 240.15c3–1(a)(6)(iv) by its very terms applies to brokers and dealers carrying a market maker account, and does not apply to Morgan Stanley, if, as Defendants contend, Morgan Stanley is a market maker, not a broker or dealer. Additionally, as Plaintiff contends, Regulation T, 12 C.F.R. § 220.3(e)(4), does not contain any provision requiring stock brokers to sell their customers' stock if it

**7.** Even assuming Morgan Stanley had the right or obligation to liquidate the shares, the legal tax result would be the same.

**1136**

drops in value and margin requirements are no longer met. Finally, Defendants admit that under the terms of the Agreement they could be liable for a deficiency in the event that the stock collateral was insufficient to satisfy the margin debt. The fact that this is unlikely to happen does not mean that Defendants would not be personally liable if it did. *See Miller,* 345 F.Supp.2d at 1051–52.

The Court concludes that the Defendants were personally liable for the debt which financed their acquisition of RealNetworks shares. Therefore, Example 2 is inapplicable to this case and the shares were transferred to Defendants on the date of exercise.

### C. *The Property was Substantially Vested on the Date of Exercise*

■ After it is transferred, the value of the property over the purchase price of that property must be included in the taxpayer's gross income the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier. I.R.C. § 83. The shares of RealNetworks at issue were transferable on the date of exercise because Defendants could have sold all of their shares on the day of exercise and walked away with the sale price over the amount owed on the margin loan. Further, the shares were not subject to a substantial risk of forfeiture. "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." I.R.C. § 83(c)(1). There is no evidence that Defendants had to perform any additional services in order to have rights to full enjoyment of the RealNetworks shares.

Therefore, because the RealNetworks shares were transferred, transferable and not subject to a substantial risk of forfeiture on the date of exercise, the RealNetworks shares acquired by Defendants were taxable on the date of exercise. The Court DENIES the Defendants' first motion for summary judgment, docket no. 11 and GRANTS the Plaintiff's motion for summary judgment, docket no. 32.

### 3. *Defendants' Second Motion for Summary Judgment*

■ In their Second Motion for Summary Judgment, docket no. 35, Defendants argue that, if the exercise of their RealNetworks options was a taxable event, under Treas. Reg. § 1.83–1(e) they are entitled to claim and should be accorded ordinary loss on the decline in the fair market value of the shares sold by Morgan Stanley on margin calls while Defendants could not sell their shares due to blackout restrictions imposed by RealNetworks. Defendants argue that because Morgan Stanley sold their shares during a blackout period, the shares were "constructively forfeited" pursuant to a lapse restriction. Plaintiff argues that the shares were not forfeited. Defendants assert that this is an issue of first impression. Neither the *Miller* decision nor the *Facq* decision addressed this issue.

Because Mr. Tuff was a RealNetworks insider, there were several periods each year during which Defendants were prohibited from selling RealNetworks shares. *See* Tuff Decl., ¶¶ 3–4, Ex. G. Morgan Stanley sold 1,200 of the Defendants' RealNetwork shares during blackout periods in 1999. *Id.,* Exs. G and H.

Treas. Reg. § 1.83–1(e) states:

Forfeiture after substantial vesting. If a person is taxable under section 83(a) when the property transferred becomes substantially vested and thereafter the

person's beneficial interest in such property is nevertheless forfeited pursuant to a lapse restriction, any loss incurred by such person (but not by a beneficiary of such person) upon such forfeiture shall be an ordinary loss to the extent the basis in such property has been increased as a result of the recognition of income by such person under section 83(a) with respect to such property.

Defendants argue that the forfeiture referenced above is a forfeiture of beneficial interest and not legal title and that Treas. Reg. § 1.83–3(i) states that a lapse restriction includes a restriction that carries a substantial risk of forfeiture. Defs.' Second Motion, docket no. 35, p. 4. Therefore, Defendants argue, because Morgan Stanley sold their shares during a blackout period restriction, which restriction they argue constitutes a substantial risk of forfeiture, Morgan Stanley's sale of their shares was a constructive forfeiture. *Id.*[8] Plaintiff argues that Treas. Reg. § 1.83–1(e) applies under circumstances which are not present in this case. Pltf.'s Response, docket no. 72, p. 4–5. Plaintiff argues that there was no forfeiture in this case. *Id.*, p. 4–6.

The Defendants' argument fails because the shares were not forfeited pursuant to a lapse restriction. Instead, their shares were sold pursuant to their agreement with Morgan Stanley. The fact that there was a blackout restriction in effect at the time when the shares were sold has no bearing on whether or not the shares would have been sold. The price of the shares dropped to the point where Morgan Stanley had to sell them in order to keep adequate collateral in the Defendants' margin account. The fact that this oc-

curred during a blackout period does not effect the legal tax consequence. Defendants were not unconditionally restricted from selling the shares, they were prohibited from selling the shares only during quarterly blackout periods. Defendants could have sold their shares during any open trading window. Instead of selling the shares, Defendants instead chose to hold the shares for investment, knowing that they might decline in value and that they would be unable to sell them during blackout periods.

In sum, the RealNetworks blackout periods were not a lapse restriction that caused the shares to be forfeited. The Defendants were the beneficial owners of the shares despite the blackout restrictions. The Defendants could have kept the shares by maintaining the margin in their Morgan Stanley account with cash or other assets. The decline in the value of the shares resulted from their "buy and hold" investment strategy, not from blackout periods. Any loss they realized from the sale of the shares by Morgan Stanley was a capital loss, not an ordinary loss. The Court DENIES the Defendants' second motion for summary judgment, docket no. 35.

*CONCLUSION*

Based on the foregoing, when Defendants exercised their RealNetworks stock options the shares were transferred to Defendants and such shares were transferable and not subject to a substantial risk of forfeiture. Therefore, the Defendants' exercise of their RealNetworks stock options was a taxable event. The Court DENIES Defendants' first motion for summary judgment, docket no. 11, and GRANTS

---

**8.** Defendants rely on *Robinson v. Comm'r,* 805 F.2d 38 (1st Cir.1986). Defendants reliance is misplaced. *Robinson* considered whether a taxpayer's ownership of shares was at substantial risk of forfeiture for purposes of

determining taxable income. Defendants attempt to rely on it for purposes of determining whether they are entitled to an ordinary loss. *Robinson* is inapplicable in this situation.

Plaintiff's motion for summary judgment, docket no. 32.

The Defendants' shares were not forfeited pursuant to a lapse restriction, therefore any loss they realized from the sale of the shares by Morgan Stanley was a capital loss. Therefore, the Court DENIES the Defendants' second motion for summary judgment, docket no. 35.

The Plaintiff is directed to serve and file a proposed judgment within 10 days of this order. Defendants will have 5 days to file any objections to the proposed form of the judgment.

IT IS SO ORDERED.