Marcus W. MELVIN and Marilyn E. Melvin, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent–Appellee.

No. 87–7377.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1988.

Decided Jan. 23, 1990.

Kevin O'Connell, O'Connell and Goyak, Portland, Or., for petitioners-appellants.

Bruce R. Ellisen, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BROWNING, TANG and FARRIS, Circuit Judges.

PER CURIAM:

Marcus Melvin appeals the Tax Court's partial disallowance of a deduction for a bad partnership loan. The Tax Court held that Melvin was "at risk" for, and therefore could deduct under 26 U.S.C. § 465, only for his pro rata share of the loan. The court disallowed the deduction of the remaining portion of the loan, even though Melvin was personally liable for the entire amount, because any portion over the pro rata share was recoverable by right of contribution under California law. We affirm.

## FACTS AND PROCEEDINGS

During 1979, Marcus Melvin owned a 71.4286 percent interest in Medici Film Partners ("Medici"), an Oregon general partnership. In 1979, Medici purchased a .872466 percent interest in ACG Motion Picture Investment Fund ("ACG"), a California limited partnership. The ACG partnership agreement provided that all rights and responsibilities of the general and limited partners would be governed by California law. Through his investment in Medici, Marcus owned a .6232 percent share of ACG as a limited partner.

Medici purchased its interest in ACG for $105,000, by making a cash down payment of $35,000 and giving a $70,000 recourse promissory note to ACG for a deferred capital contribution. The note was payable in five equal annual installments of $14,000, plus interest at nine percent per annum, to begin in 1981. Marcus' share of the down payment and recourse note was $25,000 and $50,000 respectively.

In 1979, ACG obtained a $3.5 million recourse loan from the First National Bank of Chicago. The principal was payable in full on December 14, 1981. As collateral, ACG pledged the recourse promissory notes from its 73 limited partners, which reflected their obligations to make deferred capital contributions. The combined face amount of those notes amounted to more than $8 million. Medici's $70,000 promissory note to ACG was among those notes pledged as collateral on the bank loan.

During 1979, ACG incurred a net operating loss of $12,515.318. For the purposes of this appeal, the parties stipulated that ACG had a $3.5 million outstanding recourse obligation at the end of 1979. Marcus and his wife Marilyn filed a joint 1979 tax return which claimed losses of $75,000 for his investment in ACG: $25,000 cash and $50,000 for liability on the note.

The Tax Commissioner first asserted a deficiency in Marcus' income for an unrelated deduction. After the Melvins petitioned for a redetermination of the deficiency, the Commissioner then claimed a deficiency based upon Marcus' ACG investment, arguing that Marcus Melvin was not personally liable for repayment of any portion of ACG's bank loan. Later, the Commissioner conceded that Marcus was liable for his pro rata share of the loan but argued that he was not at risk for anything beyond that. The ACG investment deficiency is the only issue on appeal by the Melvins.

The Tax Court held that Marcus was entitled to deduct his pro rata share of ACG's bank loan, that is, .6232 percent of $3.5 million for a total amount of $46,812, as well as his $25,000 cash contribution to ACG. *Melvin v. Commissioner,* 88 T.C. 63 (1987). It ruled that Marcus was "personally liable" within the meaning of section 465(b)(2) for repayment of the bank loan to the extent of the obligation on Medici's note to ACG because the note was to serve as the ultimate source for repayment if the partnership itself did not have the funds to pay the loan.

The court ruled that Marcus was personally liable for payments on Medici's note in 1979 even though the payments did not have to be made until 1981, two years beyond the taxable year in question. It based its ruling on the fact that Marcus' obligations to pay ACG were definite and fixed and that ACG negotiated the bank loan at arm's length.

Although Marcus was found to be personally liable to the bank on Medici's note, the Tax Court did not allow Marcus to deduct the entire amount of his liability. Relying upon Section 465(b)(4), the Tax Court found Marcus was not at risk for amounts exceeding his pro rata share of his partnership's $3.5 million loan. Section 465(b)(4) excludes deductions for risks that are protected by "loss-limiting arrangements". The court deemed Marcus to be protected against loss by a right of contribution under California law from his other limited partners.

Using a previously "fixed and definite" standard to determine Marcus' personal liability, the Tax Court found that it did not matter whether payment was a result of immediate or prospective protection. The court also found that whether the protection was established by state law or binding agreement between the parties did not matter.

This timely appeal followed.

## DISCUSSION

The application of the law to the undisputed facts is reviewed de novo. *Sennett v. Commissioner*, 752 F.2d 428, 430 (9th Cir.1985).

26 U.S.C. § 465(a)(1) permits an individual who invests in motion picture films to deduct any loss from his investment, to the extent that he was "at risk" in the activity at the end of the taxable year. A taxpayer is considered to be at risk for the amount of cash contributed and amounts borrowed for the activity. Section 465(b)(1)(A) and (B). With respect to borrowed funds, however, the amounts must have been borrowed for use in the activity and the taxpayer must be personally liable for repayment of such amounts or have pledged property other than property used in this activity as security for such borrowed amount. Sections 465(b)(2)(A) and (B). Furthermore, the taxpayer is not at risk for "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Section 465(b)(4).

Since 26 U.S.C. § 465(b)(4) does not specifically define "other similar arrangements", we turn to the legislative history of the section for guidance. Section 465 was added in 1976 to the Internal Revenue Code of 1954 to combat abuse of tax shelters caused by nonrecourse financing, and other "situations in which taxpayers [were] effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." *Pritchett v. Commissioner*, 827 F.2d 644, 646 (9th Cir.1987); *Porreca v. Commissioner*, 86 T.C. 821, 838 (1986).

As the Senate Finance Committee explained:

> A taxpayer's capital is not ... "at risk" ... to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of the binding agreement between himself and another person.

S.Rep. No. 938, 94th Cong., 2d Sess. 49 (1976) U.S.Code Cong. & Admin.News pp. 2897, 3439, 3484 ("Senate Report").

The Melvins rely upon the Senate Report to make three arguments as to why a right of contribution from partners under California law is not the type of loss-limiting arrangement contemplated by Section 465(b). First, they argue that the Senate Report left the right of contribution from the list of loss-limiting arrangements and signifies that Congress did not intend the right of contribution to be considered in that category. We are not persuaded because the Senate Report when enumerating examples of those type of arrangements did not contain limiting language and does not constitute an exhaustive list of such arrangements.

Second, the Melvins argue that the Senate Report indicates that Congress intend-

ed only to include situations actively arranged by taxpayers rather than the passive assumption through the force of law of the listed types of loss-limiting arrangements: Congress thus intended only to eliminate deductions where an investor has taken steps to limit his risk by arrangement or agreement with another person.

No reason is given why Congress would distinguish between protections "actively" created by an investor from ones "passively" created by state law and we see no basis for making the distinction between those kinds of protections. The legislative history of Section 465 indicates that it was enacted with a broad purpose of preventing any "situation where the taxpayer may deduct a loss in excess of his economic investment." *Id.* at 48 (1976).

Finally, the Melvins argue that Section 465(b)(4) applies only to rights created by contract rather than by tort law. They point out that the Senate Report states: "[a] taxpayer who obtains casualty insurance or insurance protecting himself against tort liability will not be considered not at risk solely because of such insurance protection," *id.* at 50, and thus, they argue, insurance against tort liability was specifically excluded to show that all types of protection under tort law are excluded from Section 465(b)(4). Congress distinguished between rights derived from contract as opposed to tort law, the Melvins argue, because procedures for obtaining reimbursement for torts are too uncertain, cumbersome and protracted to ensure protection against loss. Accordingly, they argue, reimbursement from partners under a right of contribution is uncertain because other partners may not be solvent. They point out further that under California law, a partner must obtain court permission to dissolve a partnership before seeking contribution and such permission is not always obtainable.

We find a dearth of authority for this proposition and conclude that for protection against loss we apply the same principles of logic as used to determine a taxpayer's risk in a transaction.

In *Pritchett,* we held that limited partners were "at risk" under Section 465(b) for a partnership's recourse debt even though the partners were not personally and directly liable to the creditors of the debt.

Instead of focusing on the personal and direct liability aspect we asked who had the ultimate responsibility for the debt and examined the "substance" of the transaction, not its form. *Pritchett,* 827 F.2d at 647. The "economic reality" of the situation is the key factor in determining who is ultimately liable for a debt. *Id.,* quoting *Durkin v. Commissioner,* 87 T.C. 1329, 1379 (1986).

In *Pritchett,* we found the limited partners ultimately responsible for their partnership's debt because they were contractually bound to make additional capital contributions when called upon to do so by general partners to compensate for any deficiency caused by failure to pay off the debt. Even though it was not known whether the general partners would make a cash call upon the limited partners, we held that the limited partners were at risk because the contract made the calls mandatory and "economic" reality ensured that the general partners would enforce their rights. *Id.*

Although *Pritchett* and *Durkin* involved contractual obligations, we find no basis to distinguish those obligations from those derived from tort law. Neither are we persuaded that recovery under tort law is more risky than recovery under contract law. The risk of finding a solvent obligor is present under both theories of law.

Further, the difficulty in dissolving limited partnerships is exaggerated although it is true that no contribution can be asked for until a partnership is dissolved. *Stodd v. Goldberger,* 73 Cal.App.3d 827, 837, 141 Cal.Rptr. 67, 73 (1977).

Under Cal.Corp.Code. Section 15510(1)(c) (West 1977), a limited partner has the same rights as a general partner in dissolving a partnership by decree of the court. Under Sections 15032(1)(e) and (f) of the Cal.Corp. Code, a court is required to decree a dissolution whenever the business of the part-

nership can only be carried on at a loss or when other circumstances render a dissolution "equitable". If Marcus Melvin were required to pay his obligation under the note to ACG, ACG would have been operating under a loss and a dissolution of ACG would have been required under Section 15032(1)(e).

We conclude that economic reality would dictate enforcement of the Marcus Melvin's statutory right to contribution from his other partners for amounts he would have been required to pay beyond his pro rata share of ACG's loan. As a result, Marcus Melvin would not have been the one who was ultimately liable for those excess amounts because he was protected against those losses within the meaning of 26 U.S.C. § 465(b)(4).

The Melvins finally argue that, even if the Tax Court were correct in holding that a right of contribution is a loss-limiting arrangement, its decision was wrong because no right of contribution existed for limited partners under California law at that time. This issue was not argued below. As a general rule, we will not consider an issue raised for the first time on appeal. *Bolker v. Commissioner,* 760 F.2d 1039, 1042 (9th Cir.1985). Therefore, we decline to address the issue.

The opinion of the Tax Court is AF-FIRMED.