109 T.C. No. 13


UNITED STATES TAX COURT


ROBERT L. WHITMIRE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21849-84.          Filed October 29, 1997.


        <u>Held</u>: Notwithstanding the recourse nature of a
third-party bank loan, due to various loss-limiting
features associated with a computer equipment leasing
transaction, petitioner is not to be regarded as at
risk under sec. 465, I.R.C., with regard to related
partnership debt obligations.


        <u>Stephen D. Gardner</u>, for petitioner.

        <u>Elizabeth P. Flores</u>, <u>Martin L. Shindler</u>, <u>Marcie B. Harrison</u>,

<u>Brian J. Condon</u>, <u>Victoria J. Kanrek</u>, and <u>David A. Williams</u>, for

respondent.

OPINION

SWIFT, <u>Judge</u>:  This matter is before the Court on the parties' cross-motions for partial summary judgment.  Rule 121(b).  This is a test case, and the motions for partial summary judgment raise an issue that will affect the outcome of other cases.

These cross-motions raise the general question of whether petitioner is to be regarded as at risk within the meaning of section 465 with regard to partnership debt obligations associated with a computer equipment leasing transaction.  More specifically, these motions raise the question as to whether, notwithstanding the recourse nature of a third-party bank loan, certain guaranties, commitments, suspension and setoff provisions, and matching payments, among other features of the transaction, should be treated as protecting petitioner against any realistic possibility of realizing a loss on the transaction.

For 1980, respondent determined a deficiency in petitioner's Federal income tax in the amount of $21,399.

Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

When the petition was filed, petitioner resided in Marina Del Ray, California.

Original Purchase Transaction and End-User Lease

On or about February 15, 1980, International Business Machines Corp. (IBM) sold for $2,056,060 certain computer equipment to Alanthus Computer Corp. (ACC), an equipment leasing corporation. Approximately 1 month later, on March 13, 1980, ACC sold the computer equipment to Alanthus Corp. (Alanthus), its parent corporation, for the same consideration of $2,056,060.

In connection with its purchase of the computer equipment, Alanthus borrowed $1,868,657 from Manufacturers Hanover Leasing Corp. (MHLC) in an arm's-length credit transaction. The loan proceeds were used by Alanthus, with additional cash of $187,403, to pay ACC the full purchase price of the computer equipment. ACC apparently used the proceeds received from Alanthus to pay IBM the full purchase price due on ACC's purchase of the computer equipment.

Under Alanthus' 7-year promissory note issued in favor of MHLC (Alanthus Note), beginning June 1, 1980, monthly payments of $33,875 representing principal and interest at 13.25 percent per annum were due and payable to MHLC. As collateral for the loan, MHLC received security interests in the computer equipment and in lease payments due under all end-user leases of the computer equipment until the full amount of the loan plus interest was repaid.

The Alanthus Note and security agreement do not expressly indicate whether MHLC's $1,868,657 loan to Alanthus was made on a recourse or a nonrecourse basis. The parties, however, agree and we so find that as a secured loan, under New York Uniform Commercial Code (N.Y.U.C.C.) section 9-504(2) (McKinney 1990), this loan is to be treated as made on a recourse basis.

On February 11, 1980, in anticipation of its acquisition of the above computer equipment, ACC entered into a lease agreement with Manufacturers and Traders Trust Co. (MTT) under which ACC leased the above computer equipment to MTT. Under this end-user lease, MTT was obligated to pay monthly rent of $33,875 commencing June 1, 1980, and continuing for a term of 7 years. During the 7-year term, MTT was required to make the lease payments directly to MHLC in payment of the monthly payments that were due to MHLC on the Alanthus Note.

On March 13, 1980, in connection with the sale of the computer equipment from ACC to Alanthus, ACC assigned to Alanthus its interest as lessor in the end-user lease with MTT.

Purchase by Partnership and Related Transactions

On June 30, 1980, three additional and essentially simultaneous transactions occurred involving the computer equipment with the apparent ultimate objective, among other

things, of transferring ownership[1] of the computer equipment (subject to the secured interests therein of MHLC) to Petunia Leasing Associates (Petunia), the equipment leasing partnership in which petitioner invested and through which petitioner now claims the losses and expenses at issue in this case.

In the first transaction, Alanthus sold the computer equipment and assigned its interest as lessor in the end-user lease to F/S Computer Corp. (F/S Computer). Immediately following that transaction, F/S Computer resold the computer equipment to F.S. Venture Corp. (F.S. Venture). F.S. Venture then resold the computer equipment to the Petunia partnership. MHLC's security interests in the computer equipment and in the payments due from the end user under the end-user lease were not affected by any of these transactions.

Alanthus sold the computer equipment to F/S Computer for the stated price of $2,122,329, of which $267,288 was paid in cash. As payment for the balance of the purchase price, F/S Computer assumed the $1,868,657 principal amount of Alanthus' debt obligation to MHLC and the monthly payment obligations to MHLC on the Alanthus Note.

---

[1] Use in this opinion of "ownership", "purchase", "sale", and other words that normally suggest economic and legal ownership of property, or the transfer of same, is for convenience only and does not constitute any finding or conclusion as to which entity should be regarded, for income tax purposes, as the owner of the computer equipment.

In the second transaction, F/S Computer sold the computer equipment to F.S. Venture for the stated price of $2,056,060. F.S. Venture paid $20,000 in cash to F/S Computer, issued to F/S Computer a promissory note in the amount of $1,982,289, and assigned to F/S Computer the right to receive an additional $53,771 due from Petunia.

The loan documentation and the promissory note of F.S. Venture in favor of F/S Computer do not indicate whether this loan was made on a recourse or nonrecourse basis. F/S Computer did not receive a security interest in the computer equipment or any other collateral with regard to the $1,982,289 promissory note it received from F.S. Venture.

F.S. Venture did not assume the debt obligation of Alanthus or of F/S Computer with regard to the $1,868,657 loan of MHLC.

Further, under a commitment agreement dated June 30, 1980, between F/S Computer and F.S. Venture (Commitment Agreement), F/S Computer agreed, for the benefit of F.S. Venture and all subsequent purchasers of the computer equipment including Petunia, to satisfy all principal and interest payment obligations relating to the $1,868,657 MHLC loan and all monthly lease payments relating to the end-user lease. The Commitment Agreement expressly provided as follows:

> In order to induce * * * [F.S. Venture] to acquire the Equipment subject to the * * * [MHLC loan] * * * [F/S Computer] hereby agrees, for the benefit of * * * [F.S. Venture] and any subsequent purchaser of the Equipment

> * * * [that F/S Computer] will satisfy all obligations
> due under * * * [the MHLC loan] * * *. * * *

In the third transaction, F.S. Venture sold to Petunia the computer equipment for the stated price of $2,056,060 represented by a cash downpayment of $34,268 and a promissory note from Petunia in the total principal amount of $2,021,792 (Partnership Note).

Petunia did not assume the debt obligation of Alanthus or of F/S Computer with regard to the MHLC $1,868,657 loan, nor did Petunia assume the debt obligation with regard to F/S Computer's loan of $1,982,289 to F.S. Venture.

Petunia's $2,021,792 stated debt obligation to F.S. Venture on the Partnership Note is referred to generally in loan documents as a limited recourse obligation of Petunia. Under terms of the Partnership Note and Petunia's partnership agreement, each limited partner is stated to be personally and, on a recourse basis, liable for stated principal on the Partnership Note to the extent of 434.75 percent of each limited partner's total capital contributions to the partnership (subject to certain adjustments pursuant to the partnership agreement).

Under an agreement between Petunia and F.S. Venture (that accompanied Petunia's Partnership Note), F.S. Venture was obligated to make any outstanding payments (or to make provision for such payments) due to a senior lienholder, such as MHLC, in order to prevent the senior lienholder from foreclosing on the

computer equipment. In the event that F.S. Venture failed to make such payments or to make provision for such payments, Petunia's obligations under the Partnership Note would be suspended until the last installment of the Partnership Note was due and payable. At that point in time, if the loan from the senior lienholder remained in default, Petunia would be entitled to set off any amounts it owed on the Partnership Note against any amounts that F.S. Venture owed to the senior lienholder as a result of this security agreement.

Under the $2,021,792 Partnership Note, interest accrued at 12 percent per annum and payment of prepaid interest in the amount of $308,409 was due and payable on July 30, 1980, of which $188,472 was immediately payable in cash and the balance was represented by delivery of a promissory note with a principal amount of $119,937. Also under the Partnership Note, on July 1, 1980, an interest payment of $674 was due and payable by Petunia to F.S. Venture, and from July 1, 1980, to December 1, 1982, monthly interest payments of $9,938 were due and payable to F.S. Venture. From January 1, 1983, through December 1, 1989, monthly principal and interest payments totaling $35,690 on the Partnership Note were due and payable to F.S. Venture.

Petunia's monthly payment obligations to F.S. Venture (of $9,938 that were due from July 1, 1980, to December 1, 1982, and

of $35,690 that were due from January 1, 1983, through December 1, 1989) matched F.S. Venture's monthly payment obligations owed to F/S Computer under F.S. Venture's promissory note to F/S Computer.

In connection with Petunia's purchase of the computer equipment from F.S. Venture, F.S. Venture assigned its rights against F/S Computer under the Commitment Agreement to Petunia.

Further, on June 30, 1980, MHLC, F/S Computer, F.S. Venture, and Petunia entered into a separate side agreement (Side Agreement) that expressly provided that Petunia and the partners of Petunia had no liability whatsoever with regard to MHLC's $1,868,657 recourse loan that was made to Alanthus and that was assumed by F/S Computer.  The Side Agreement expressly provided as follows:

> * * * [MHLC] agrees that * * * [Petunia] has no personal liability whatsoever for payment of the amounts due under * * * [the loan from MHLC to Alanthus] or [for] satisfaction of * * * [Alanthus'] obligations thereunder. * * *

Leaseback Transaction to F/S Computer

Simultaneous with the above three sale transactions and with the other agreements that were entered into on June 30, 1980, Petunia leased the computer equipment back to F/S Computer for a term of 9½ years beginning on June 30, 1980, and ending on December 31, 1989.  Under the leaseback transaction, F/S Computer's monthly rent payments of $9,938 that were payable to

Petunia from July 1980 to December 1982, matched Petunia's monthly debt obligations owed to F.S. Venture under the Partnership Note. From January 1983 through December 1989, F/S Computer's monthly rent payments of $35,935 that were payable to Petunia slightly exceeded Petunia's monthly debt obligations of $35,690 owed to F.S. Venture under the Partnership Note.

Pursuant to the lease agreement with F/S Computer, and in addition to the lease payments mentioned above, Petunia also was entitled to receive from F/S Computer, 40 percent of all net rental income until June 30, 1989, with respect to the end-user lease after end-user lease payments had been applied to payments due MHLC under the Alanthus Note. Thereafter, Petunia was entitled to receive 90 percent of all net rental income with respect to the end-user lease until termination of the lease period.

At the time of the above transactions, F/S Computer and F.S. Venture were wholly owned by Funding Systems Asset Management Corp. (Funding). Funding in turn was wholly owned by FSC Corp. (FSC).

In order to induce Petunia to enter into the above purchase and lease transactions with F.S. Venture and F/S Computer, FSC unconditionally and on a full recourse basis expressly guaranteed Petunia and its limited partners the full performance of all obligations of F/S Computer under F/S Computer's leaseback of the

computer equipment from Petunia.  The written guaranty from FSC

(Guaranty Agreement) provided, in relevant part, as follows:

> FSC CORPORATION (the "Guarantor") * * * does hereby
> unconditionally guarantee to [Petunia] * * * the prompt
> and full performance and observance of all of the
> covenants, conditions and agreements of [F/S Computer]
> * * * including, without limitation, the full and
> prompt payment when due, whether by acceleration or
> otherwise, in accordance with the terms of the Lease,
> of rent and all other sums payable by * * * [F/S
> Computer] to * * * [Petunia], whether absolute or
> contingent, secured or unsecured, matured or unmatured,
> and without regard to any grace periods provided for in
> the Lease, including, without limitation, payment of
> any stipulated loss value, deficiency payments, and all
> other sums due upon an Event of Default by * * * [F/S
> Computer] * * *. * * *

Under the Guaranty Agreement, FSC also expressly guaranteed F/S

Computer's obligations to Petunia under the Commitment Agreement

that had been assigned by F.S. Venture to Petunia.

Petitioners' Investment in Petunia and Losses Claimed

On June 27, 1980, petitioner executed a subscription

agreement pursuant to which petitioner became obligated to

contribute $25,032 to the capital of Petunia in exchange for a

limited partnership interest in the partnership.  Petitioner's

contribution was reflected by $16,282 in cash that was paid to

Petunia and by an $8,750 recourse promissory note issued by

petitioner in favor of Petunia.

During June of 1980, petitioner and other investors executed

subscription agreements obligating them to contribute a total of

$339,173 to the capital of Petunia. Petunia received $339,173 in capital contributions of which $220,611 was contributed in cash and the remainder of which was represented by promissory notes.

On Schedule E of his Federal income tax return for 1980, petitioner reported flow-through losses from Petunia totaling $40,623.

On audit, respondent disallowed the $40,623 in partnership losses claimed by petitioner.

Discussion

Summary judgment or partial summary judgment may be granted if the pleadings and other materials demonstrate that no genuine issue exists as to any of the material facts and that a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).

In Levien v. Commissioner, 103 T.C. 120, 125-130 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996), Thornock v. Commissioner, 94 T.C. 439, 447-449 (1990), and Levy v. Commissioner, 91 T.C. 838, 862-865 (1988), we explained generally legal principles applicable to the at-risk issue involved in this case. Under section 465, where individual investors or closely held corporations engage in the leasing of depreciable property, any loss with respect to the leasing activity is allowed only to the extent the investors are

financially at risk with respect to the leasing activity at the close of the taxable year. Sec. 465(a)(1), (c)(1)(C).[2]

Investors generally are considered to be financially at risk with respect to investments in leasing activities to the extent they contribute money to the activities. Sec. 465(b)(1)(A). Investors also are considered to be financially at risk with respect to debt obligations of leasing activities to the extent they are personally liable for repayment of the debt obligations or to the extent they have pledged property, other than the property used in the activities, as security for the borrowed amounts. Sec. 465(b)(2).[3]

---

[2] Sec. 465 was added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1531, and applies to tax years beginning after Dec. 31, 1975.

[3] Sec. 465(b)(2) provides as follows:

(2) Borrowed Amounts.n-For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he--

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

With respect to particular debt obligations, investors will be regarded as personally liable for such obligations within the meaning of section 465(b)(2)(A) if they are ultimately economically liable to repay the obligations in the event funds from the investment activities are not available to repay the obligations. The fact that other investors or participants remain in the "chain of liability" does not preclude investors who have the ultimate economic liability from being treated as at risk. In determining which investors or participants in a transaction are ultimately financially responsible for the debt obligations, the substance of the transaction controls. Pritchett v. Commissioner, 827 F.2d 644, 647 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985); Follender v. Commissioner, 89 T.C. 943, 949-950 (1987); Melvin v. Commissioner, 88 T.C. 63, 75 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990); see also Raphan v. United States, 759 F.2d 879, 885 (Fed. Cir. 1985).

The above limitation on debt obligations with respect to which investors will be considered at risk is expressly reflected in the statutory scheme. Section 465(b)(4)[4] provides that even

---

[4] Sec. 465(b)(4) provides as follows:

(4) Exception.--Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

though investors nominally may be personally liable with respect to debt obligations, for income tax purposes they will not be considered at risk for debt obligations if their ultimate liability with respect to the debt obligations is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements."

The language "other similar arrangements" is not specifically defined in the Code or in the legislative history, but the legislative history evidences concern with situations in which investors are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction is not profitable.  Levien v. Commissioner, supra at 125-130; Larsen v. Commissioner, 89 T.C. 1229, 1272-1273 (1987), affd. in part, revd. and remanded in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Bennion v. Commissioner, 88 T.C. 684, 692 (1987); Melvin v. Commissioner, supra at 70-71; Porreca v. Commissioner, 86 T.C. 821, 838 (1986); S. Rept. 94-938 at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87.

As applied particularly to a highly leveraged, tax-oriented equipment leasing transaction (and depending on the issues raised), the above principles require us to analyze the substance and commercial realities of all material aspects of the transaction.  Neither the form chosen, the labels used, nor a single feature of the transaction generally will control.

In <u>American Principals Leasing Corp. v. United States</u>, 904 F.2d 477 (9th Cir. 1990), it was stated with regard to section 465(b)(4), as follows:

> the purpose of subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured--by whatever method--to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the deductions for previous years that were suspended under this subsection. [<u>Id.</u> at 483; citations omitted.]

The potential bankruptcy or insolvency of entities providing guaranties or loss protection to investors is not considered in applying section 465(b)(4) unless it creates a realistic possibility of economic loss. <u>Thornock v. Commissioner</u>, 94 T.C. 439, 454 (1990); <u>Capek v. Commissioner</u>, 86 T.C. 14, 52 (1986). In this regard, the report from the Senate Finance Committee with respect to section 465 states as follows:

> For purposes of this rule [i.e. section 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial

difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938 at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88.]

In Thornock v. Commissioner, 94 T.C. 439 (1990), a case with facts similar to the instant case, we held that no realistic possibility existed that limited partners would be ultimately liable on partnership debt obligations.  Our holding was based primarily on the presence of rent guaranties, the essentially offsetting nature of the various lease and note payments, the nonrecourse nature of the underlying third-party loan, and other insulating features of the equipment leasing transaction.  We emphasized that no one feature of the transaction controlled our analysis.

The parties have agreed that under New York commercial law the underlying $1,868,657 third-party loan from MHLC to Alanthus should be treated as a recourse loan.  See N.Y.U.C.C. section 9-504(2) (McKinney 1990), which provides that a secured loan generally is to be treated as a recourse loan where the parties to the loan fail to designate the loan as either recourse or nonrecourse.[5]

---

[5]    N.Y.U.C.C. sec. 9-504(2) (McKinney 1990) provides in part as follows:

>     (2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus [after proceeds from the sale of

(continued...)

In an attempt to distinguish the instant case from Thornock v. Commissioner, supra, and other similarly decided cases, petitioner emphasizes the recourse nature, under New York law, of the underlying third-party secured loan of MHLC. Petitioner describes various scenarios under which petitioner alleges that there would exist a realistic possibility that petitioner ultimately would be required to make actual payments on the partnership loan if MHLC, the third-party creditor, pursued collection from F/S Computer, F.S. Venture, or from Petunia. Petitioner argues that, primarily because of the recourse nature of the Alanthus promissory note to MHLC, petitioner was not insulated from liability on Petunia's debt obligations. Petitioner further argues that section 465(b)(4) should not apply to rent guaranties.

We disagree with each of petitioner's arguments. Analyzing the substance of the equipment leasing transaction before us, we conclude that petitioner and the other limited partners of Petunia are not to be treated as at risk under section 465 with respect to the debt obligations of Petunia. The limited partners of Petunia were protected from any realistic possibility of economic loss on this transaction.

---

[5]     (...continued)
    collateral are applied to the outstanding debt], and,
    unless otherwise agreed, the debtor is liable for any
    deficiency. * * *

Assuming that MTT defaulted on its lease obligations under its end-user lease and that MHLC commenced collection efforts that broke the circle of payments (or accounting entries) between F/S Computer, F.S. Venture, and Petunia jeopardizing Petunia's ability to make payments due on its debt to F.S. Venture, before any liability of the limited partners would be triggered, FSC would have been required to honor its obligations under the Guaranty Agreement, thereby providing funds needed by Petunia to pay F.S. Venture. FSC, through its guaranties--not the limited partners of Petunia--would be required to provide funds (or accounting entries) necessary to keep payments current on the debt obligations of Petunia.

The obligations of FSC and F/S Computer under the Guaranty and Commitment Agreements, the suspension and setoff provisions under the purchase agreement between F.S. Venture and Petunia, the fact that F.S. Venture and Petunia did not assume Alanthus' recourse promissory note to MHLC, the provisions of the Side Agreement (to which MHLC itself was a party) that expressly immunized Petunia from any liability on Alanthus' recourse promissory note to MHLC, and the matching payments under the various essentially offsetting obligations effectively immunized Petunia from any realistic possibility for loss in connection with the transaction in issue.

Petitioner suggests a scenario under which FSC would not honor its guaranties, and petitioner suggests that under that

scenario the limited partners of Petunia likely would be required to make payments on Petunia's debt obligations to F.S. Venture. In that scenario, on the basis of the relationships between the various parties, the guaranties of FSC, the Commitment and Side Agreements, and the suspension and setoff provisions of the agreement between F.S. Venture and Petunia, we believe the limited partners of Petunia would have legal defenses against FSC, F/S Computer, F.S. Venture, and MHLC that would protect the limited partners of Petunia from any realistic obligation to make any actual payments under the Partnership Note.

Further, the hypothetical inability of a guarantor such as FSC to satisfy guaranty obligations due to bankruptcy or insolvency generally is not to be considered in applying section 465(b)(4) unless it contributes to a realistic possibility of economic loss. Thornock v. Commissioner, 94 T.C. 439, 454 (1990); Capek v. Commissioner, 86 T.C. 14, 52 (1986); S. Rept. 94-938 at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88; see also Van Roekel v. Commissioner, T.C. Memo. 1989-74, 56 T.C.M. (CCH) 1297, 1307-1308, 1989 T.C.M. (P-H) par. 89,074, at 89-341; Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991), with regard to the significance of a parent corporation's guaranty of its subsidiary's debt obligation.

We do not believe that under any of petitioner's suggested scenarios Petunia and its limited partners would be held liable for the debt obligations associated with this transaction.

Petitioner's scenarios are so remote and theoretical as to be commercially unrealistic and improbable. See Casebeer v. Commissioner, 909 F.2d 1360, 1369 (9th Cir. 1990), affg. in part, revg. and remanding in part Larsen v. Commissioner, 89 T.C. 1229 (1987); American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990); Waters v. Commissioner, T.C. Memo. 1991-462, affd. 978 F.2d 1310 (2d Cir. 1992).

Finally, we do not agree with the argument petitioner makes that section 465(b)(4) should be restricted only to loss protection guaranties that relate directly to the particular debt obligations for which a taxpayer claims to be at risk. The total integrated transaction and all of its associated guaranties, commitments, and setoff provisions are to be taken together. FSC's guaranties constituted an integral part of the loss-limiting arrangement that insulated Petunia and its limited partners from any realistic risk of loss associated with this transaction. FSC's obligations under the Guaranty Agreement should not be disregarded. See Thornock v. Commissioner, supra at 451.

Due to the offsetting nature of the lease and note payments, the presence of the Guaranty, Commitment and Side Agreements, the presence of the suspension and setoff provisions, and the relationships of the parties involved in the transaction, we conclude that Petunia participated in a loss-limiting arrangement under section 465(b)(4) and that no realistic possibility existed

that petitioner would be ultimately liable to make payments on Petunia's debt obligations to F.S. Venture.

Notwithstanding the recourse nature of the underlying third-party loan between MHLC and Alanthus, other significant features of the transaction, as explained above, immunized petitioner and the other limited partners of Petunia from any realistic possibility of liability with regard to the Partnership Note. We conclude that petitioner is to be treated as not at risk within the meaning of section 465 with respect to his allocable share of the Partnership Note.

To reflect the foregoing,

An appropriate order will be issued.