**Robert L. WHITMIRE, Petitioner–Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 98–70495.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1999.

Decided May 28, 1999.

Stephen D. Gardner, Kronish, Lieb, Weiner & Hellman, New York, New York, for the plaintiff-appellant.

Joan I. Oppenheimer, United States Department of Justice, Washington, D.C., for the defendant-appellee.

Before: O'SCANNLAIN, WARDLAW, and FLETCHER, Circuit Judges.

WARDLAW, Circuit Judge:

We are asked to determine the extent of loss protection a taxpayer may build into a business transaction so as to eliminate any realistic possibility of actual loss from an unprofitable deal, yet remain "at risk" and entitled to a deduction for invested amounts under Internal Revenue Code 26 U.S.C. § 465. This issue arose in 1980, when taxpayer Robert L. Whitmire ("Whitmire") claimed an "at risk" deduction under section 465 for his investment in a New York limited partnership, Petunia, one of many companies involved in a complex computer "sale-leaseback" transaction. The IRS Commissioner denied Whitmire's deduction, and Whitmire petitioned the tax court, seeking a reversal of the Commissioner's decision. Like the Commissioner, the tax court found that the risk in Whitmire's complex leasing transaction was so layered with protections that the investment crossed the line into the exception to section 465, which excludes deductions where loss protections remove any realistic possibility that the taxpayer will suffer a loss. We agree, and therefore affirm the decision of the tax court.

I

An appeal from the tax court may be taken to the United States Court of Appeals for the circuit in which the petitioner's legal residence was located at the time the petition was filed in the tax court. 26 U.S.C. § 7482(b)(1)(A) (1994). Whitmire was a legal resident of California at the time the petition was filed; therefore we have jurisdiction over his appeal.

We review *de novo* the tax court's application of law to undisputed facts. *Melvin v. Commissioner*, 894 F.2d 1072, 1074 (9th Cir.1990); *Sennett v. Commissioner*, 752 F.2d 428, 430 (9th Cir.1985). Grants of summary judgment are also reviewed *de novo*. *Talley Indus. Inc. v. Commissioner*, 116 F.3d 382, 385 (9th Cir.1997). Thus, because Whitmire appeals the tax court's summary judgment on stipulated facts, we must review *de novo* the tax court's decision in this case.

II

Whitmire claimed a deduction based on the purported risk involved in his investment in Petunia, a New York limited partnership engaged in a circular computer equipment sale-leaseback transaction with several other companies. Because Whitmire's risk and protections against loss did not entirely depend upon Petunia, we must examine the artfully structured transaction from which his claimed deduction arose.

A. Creation of the MHLC Loan and MTT Lease

The story of the business deal in which Whitmire invested begins several transactions away from Petunia's involvement. The first step in what would become a myriad of transfers and cross-agreements occurred on February 15, 1980, when International Business Machines Corporation ("IBM") sold computer equipment to Alanthus Computer Corporation ("ACC"). In anticipation of this sale, on February 11, 1980, ACC had contracted to lease the computer equipment to Manufacturers Traders Trust Company ("MTT"; "User Lease").

Approximately one month later ACC sold the computer equipment and assigned the User Lease to its parent company, Alanthus Corporation ("Alanthus"). Alanthus paid for the equipment with a recourse loan financed by Manufacturers Hanover Leasing Corporation ("MHLC"; "MHLC Loan"), and secured by the equipment. Alanthus entered into a security agreement with MHLC ("MHLC Security Agreement") which stated that MTT would make the lease payments directly to MHLC in satisfaction of the loan, and that Alanthus would become personally liable if MTT defaulted.

## B. The June 30, 1980 Transactions

### 1. The Alanthus Sale to F/S

On June 30, 1980, in the first of many related transactions on that day, Alanthus sold the computer equipment to F/S Computer Corporation ("F/S"). Alanthus and F/S executed an agreement by which F/S assumed all of Alanthus's rights under the User Lease. In exchange, F/S also assumed all of Alanthus's obligations under the MHLC loan and agreements.

### 2. The F/S Sale to Venture

That same day, F/S sold the equipment and assigned the User Lease to F.S. Venture ("Venture"), subject to MHLC's and MTT's interests in the equipment. F/S also executed a "Commitment Agreement," stating that F/S would satisfy all obligations due with respect to MHLC's security interest. In return, Venture issued a promissory note payable to F/S ("Venture–F/S note"). It is unclear whether the Venture–F/S note was recourse or non-recourse.[1]

### 3. The Venture Sale to Petunia

Venture immediately resold the computer equipment and assigned the User Lease to Petunia. Petunia purchased the equipment subject to the rights of MTT under the User Lease, and to MHLC's rights under the MHLC Loan and MHLC Security Agreement. Venture also assigned to Petunia all of Venture's rights under the Commitment Agreement.

Petunia gave Venture a Limited Recourse Installment Promissory Note ("Petunia–Venture Note"). Under the terms of the Petunia–Venture Note, each of the Petunia partners was also severally and personally liable for each of the installments of principal due; the liability of each partner was limited absolutely to 434.75% of the partner's contributions.

### 4. The F/S Lease

Also on June 30, 1980, Petunia leased the equipment to F/S for a term of nine years and six months ("F/S Lease"), beginning on June 30, 1980. Notably, F/S's monthly rental payments matched Petunia's monthly payments on the Petunia–Venture Note from July 1980 to December 1982; after 1982 the lease payments would slightly exceed Petunia's obligations. In addition, Petunia would receive a percentage of net rental income. The lease also provided that F/S would indemnify Petunia for any losses resulting from F/S's failure to perform the terms of the lease.

### 5. The FSC Guarantees

In the last of the June 30, 1980 transactions, FSC, the grandparent company of F/S and Venture, unconditionally and on a full recourse basis guaranteed F/S's full performance of the Master Lease. FSC also guaranteed F/S's obligations to Petunia under the Commitment Agreement which Venture had assigned to Petunia.

## C. Whitmire's Liability

On June 20, 1980 Whitmire executed a subscription agreement and power of attorney pursuant to which he became obligated to contribute $25,031.50 to Petunia in exchange for a limited partnership interest. Whitmire made his contribution with $16,281.50 in cash and a recourse promissory note for $8,750. As a Petunia limited partner, Whitmire was personally liable on the Petunia–Venture Note for an amount up to 434.75% of his capital contribution.

On Schedule E of his 1980 federal income tax form, Whitmire reported $40,623 in flow-through losses from Petunia. The Commissioner disallowed Whitmire's 26 U.S.C. § 465 deduction for certain "at risk" investments, and found a $21,399 deficiency in Whitmire's income tax for the year.

---

**1.** *See Whitmire v. Commissioner,* 109 T.C. 266, 269, 1997 WL 668965 (1997).

Whitmire filed a petition in the tax court, seeking a redetermination of the deficiency. The tax court granted the Commissioner's motion for summary judgment, holding that as a matter of law Whitmire was not "at risk" within the meaning of 26 U.S.C. § 465(b)(4), and finding a $10,784 deficiency in Whitmire's income tax for the year 1980.

### III

#### A. The Section 465 Statutory Scheme

■ "The Internal Revenue Code provides that a taxpayer may take a deduction from leasing depreciable property only to the extent that he is at risk in the leasing activity." *American Principals Leasing Corp. v. United States*, 904 F.2d 477, 482 (9th Cir.1990) (citing 26 U.S.C. § 465). "A taxpayer is at risk for the amount of cash he has contributed to an activity and for the amount he has borrowed with personal liability for use in the activity." *Id.* In addition, section 465 sets forth in various subsections certain types of investments which are exceptions to the rule permitting deductions. *See* 26 U.S.C. § 465.

The question before us is whether Whitmire was "at risk" within the meaning of 26 U.S.C. § 465. To answer this question, we must evaluate (1) whether Whitmire was personally liable for the amount he claimed, and (2) whether he fell under one of the exceptions to the rule. *See American Principals*, 904 F.2d at 482.

#### B. Personal Liability

"Generally, a taxpayer is at risk for the amount of cash invested in the activity and for amounts borrowed for which there is personal liability." *Casebeer v. Commissioner*, 909 F.2d 1360, 1368 (9th Cir.1990). A taxpayer is personally liable if the "tax-

payer would legally be responsible for his debt under a worst-case scenario." *American Principals*, 904 F.2d at 482. Here it is undisputed that as a partner Whitmire incurred personal liability under the Petunia–Venture Note. Therefore, the remaining question is whether, under a "worst-case scenario," Whitmire would have suffered a loss in this transaction.

■ In this case, the worst case scenario would have occurred if (1) MTT ceased making loan-satisfying lease payments; (2) MHLC turned to F/S for the payments and F/S defaulted—thereby breaching its Commitment Agreement with Petunia; (3) FSC breached its guarantee of F/S's Commitment Agreement; (4) MHLC seized F/S's assets including the Venture–F/S Note[2] and thus demanded payment from Venture; (5) Venture defaulted; (6) MHLC seized Venture's assets, including the Petunia–Venture Note; (7) the security lien on the computers turned out to be worth less than the amount owed on the MHLC Note; (8) F/S breached its promise to pay rent; (9) FSC failed to fulfill its guarantee of F/S's rent and promise to indemnify; (10) Petunia lacked the resources to make payments on the Petunia–Venture Note; and (11) MHLC looked to the partnership obligations on the Petunia–Venture Note for repayment.

As this hypothetical shows, if every party breached all their commitments, MHLC could call upon Whitmire to make contributions up to the extent of his personal liability on the Petunia–Venture Note. Thus, under the worst case scenario Whitmire was personally liable for the MHLC debt up to the amount of 434.75% of his contribution. Therefore, Whitmire satisfies step one of our inquiry.

---

**2.** The tax court specifically found that it was unclear whether the Venture–F/S Note was recourse or non-recourse. *See Whitmire v. Commissioner*, 109 T.C. at 268–70. Whitmire's liability, however, depended on the Venture–F/S Note holder's ability to seize Venture's assets, and therefore depends on the Venture–F/S Note being a recourse note. Although the note's status is unclear, we conclude that Whitmire was not "at risk" even if the note were a recourse note. Therefore, because it will not change the outcome of the case, this opinion proceeds as if the note were a recourse note.

### C. The Section 465(b)(4) Exception

#### 1. Content and Purpose

■ The tax court held that despite Whitmire's personal liability, Whitmire was not entitled to a deduction because he had engaged in "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements" which constitute an exception to the "at risk" determination under section 465(a). *See* 26 U.S.C. § 465(b)(4).[3] The purpose of this exception is "to suspend at risk treatment where a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." *American Principals,* 904 F.2d at 483. Worst case scenarios are not appropriate when determining whether a section 465(b)(4) arrangement exists; instead "economic reality" is our guide, and a mere "theoretical possibility" that a taxpayer will suffer loss is insufficient to avoid the exception. *See id.; Casebeer,* 909 F.2d at 1369. *Accord Waters v. Commissioner,* 978 F.2d 1310, 1316 (2d Cir. 1992); *Young v. Commissioner,* 926 F.2d 1083, 1088 (11th Cir.1991); *Moser v. Commissioner,* 914 F.2d 1040, 1048 (8th Cir. 1990). Therefore, for Whitmire to be entitled to a deduction, he must also have been "at risk" in a realistic economic sense.

We conclude that Whitmire was not at risk under section 465 because he was protected from loss by section 465(b)(4) guarantees, and because the scenario under which Whitmire would suffer loss was no more than a "theoretical possibility" based on the fulfillment of remote numerous contingencies.

#### 2. Guarantees

To the extent that Whitmire was protected against loss by guarantees, Whitmire crossed over the line between section 465 and the subsection (b)(4) exception, and in the process lost any entitlement to deductions under section 465. The plain language of the exception provides that "guarantees" protect taxpayers against loss. *See* 26 U.S.C. § 465(b)(4). This rule, its legislative history, and legal precedent dictate that we make "at risk" and "loss protection" or "similar arrangements" determinations with the assumption that guarantees will be fulfilled. *See American Principals,* 904 F.2d at 481–82. " 'For purposes of [subsection 465(b)(4) ], it will be assumed that a loss-protection guarantee . . . will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer.' " *Id.* at 482 (quoting S.Rep. No. 94–938, at 50 n. 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3439, 3486 n. 6 (internal quotation marks omitted)).

The "economic reality" of this situation is that Whitmire joined a transaction in which numerous guarantees protected him against loss. FSC guaranteed F/S's promise to make payments on the MHLC Loan and F/S's obligations under the F/S Lease, which included both lease payments and a promise to indemnify Petunia for any harm resulting from a lease payment default. As long as Petunia continued to receive the F/S lease payments, be it from F/S under the lease or FSC through the guarantee, Petunia could meet its obligations under the Petunia–Venture Note, and Whitmire would never be called upon to personally satisfy the debt.

Whitmire argues that a rent guarantee should not be considered protection against loss because rent itself is not. *See Sacks v. Commissioner,* 69 F.3d 982, 989 (9th Cir.1995). Whitmire also claims that the effect of the FSC guarantees was merely to add the credit of FSC to that of F/S with respect to the lease agreement. Whitmire further argues that it was im-

---

**3.** 26 U.S.C. § 465(b)(4) provides: "Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements."

possible for the combined credit of F/S and FSC to protect him from loss, citing *Gefen v. Commissioner*, 87 T.C. 1471, 1503, 1986 WL 22070 (1986), in which the tax court held that debt payments offset by leases to companies even as big as Exxon do not constitute section 465(b)(4) loss protection provisions.

Were Whitmire and Petunia relying solely on the F/S lease payments to make payments on the Petunia–Venture Note, Whitmire might legitimately have been "at risk." Because evaluation of "at risk" status assumes an unprofitable transaction, *see American Principals*, 904 F.2d at 483, there is risk in using lease proceeds to make debt payments due to the possibility that the lessee will default. Since the analysis assumes an unprofitable transaction, the relative size or creditworthiness of the lessee is irrelevant. Thus, in an "at risk" determination it would not matter whether the lessee is a corporate giant like Exxon or a corner market; an "unprofitable transaction" means a possibility of default.

However, Whitmire's attempt to classify his transaction with those of other taxpayers using lease proceeds to make debt payments is disingenuous, because Whitmire had the benefit of the FSC guarantees. In contrast to our treatment of lessees in an "at risk" evaluation, we assume that guarantees will be fulfilled. *See id.* Thus, even when we imagine that an unprofitable transaction exists with respect to a lease, we expect that guarantees of that lease will be upheld. In this way a guarantee of a lease circumvents the risk in using lease payments to fulfill loan debt.

Here Petunia relies on the fulfillment of the F/S Lease, with respect to either the lease payments or the promise of indemnification, in order to make payments on the Petunia–Venture Note. By guaranteeing the performance of these terms, FSC has removed the risk involved in Petunia's reliance on the F/S Lease. Since Whitmire's risk is dependent on Petunia's inability to make payments on the Petunia–Venture Note, FSC's guarantees effectively protect Whitmire from risk as well. Therefore, the FSC guarantees, because they remove the risk in the use of lease proceeds to make debt payments, place Whitmire squarely within the exception to the rule under which he claims to be entitled to deductions.

Whitmire also asserts that the FSC guarantees should not be considered loss protections because they came from the grandparent company of the lessor. The fact that FSC was F/S's grandparent company made it more likely that the two would suffer financial difficulties at the same time than if the two were unrelated. However, it does not mean that an F/S default would have resulted in FSC's inability to fulfill its guarantees. First, the record does not indicate whether F/S comprised a large portion of FSC's assets, nor does Whitmire allege this. In addition, FSC, as the grandparent company, is two generations removed from F/S, implying a greater degree of differentiation than found, for example, in a parent company guarantee, which was considered a section 465(b)(4) loss protection provision by the Eleventh Circuit. *See Young*, 926 F.2d at 1088.

Further, Whitmire agrees that even parent company guarantees affect the "level of risk to which the lessor's investment is exposed." Whitmire argues that because the guarantees do not diminish the amount at risk, they do not protect against loss. However, a provision which reduces the level of risk to which the investment is exposed directly determines whether there is a "realistic possibility that the taxpayer will suffer an economic loss."[4] *American Principals*, 904 F.2d at 483.

---

4. Whitmire also contends that the guarantees are not section 465(b)(4) provisions because such provisions include only "similar arrangements" which apply after a loss is sustained; include only "loss-protection guarantees, repurchase agreements, and insurance policies"; and apply only to the same agreement which creates the liability.

The plain language of the statute states that guarantees are section 465(b)(4) provisions, and the "economic reality" is that the guarantees protected Whitmire from loss. Therefore, the protection which the FSC guarantees offered Whitmire put him within the section 465(b)(4) exception, and Whitmire is not entitled to a deduction under section 465.

### 3. Economic Reality

In addition to determining the existence of specific kinds of provisions listed by section 465(b)(4), we also consider the overall transaction in light of the purpose of the exception. When we evaluate whether a taxpayer is protected against risk within the meaning of 465(b)(4), we allow deductions where there is a "realistic possibility" of risk, but draw the line where risk exists only as a "theoretical possibility." *See American Principals*, 904 F.2d at 483. Although cases that fall somewhere between those standards may arise, we conclude that the scenario in which Whitmire would be at risk clearly lies within the realm of mere "theoretical possibility."

Whitmire apparently intended for the transaction to leave him "at risk" in a technical sense, while putting numerous contingencies between a potentially unprofitable transaction and any real chance that he would ever suffer a loss. This is reflected by the number of events which had to take place prior to Whitmire realizing any financial harm. Whitmire would not be required to make payments on the Petunia–Venture Note unless all of the following were to occur: (1) MTT ceased making loan-satisfying lease payments to MHLC; (2) F/S, Venture, and FSC defaulted on their respective obligations to

MHLC and Petunia; (3) the computer equipment was insufficient to satisfy the MHLC Loan balance; (4) MHLC seized Venture's assets; (5) Petunia was not otherwise able to satisfy the Petunia–Venture Note; and (6) MHLC held Whitmire personally liable under the Petunia–Venture Note.

Despite Whitmire's efforts to prove himself susceptible to harm, his risk became more remote with each contingency upon which he relied to show himself "at risk." The dependency of Whitmire's argument upon such a large number of defaults among the numerous parties made the proffered loss more of a "theoretical possibility" than an "economic reality." In fact, in his "at risk" scenario, Whitmire assumes the default and insolvency of every party to the transaction; in short, his hypothetical is a "worst case scenario" which is not appropriate for section 465(b)(4) evaluations. *See American Principals*, 904 F.2d at 483.

We have found that a taxpayer subject to far fewer protections than Whitmire nevertheless fell within the section 465(b)(4) loss protection exception and was therefore not "at risk." *See Casebeer*, 909 F.2d 1360. In *Casebeer*, a taxpayer assumed secondary personal liability on a portion of the primary obligor's obligation to a creditor. The primary obligor promised to make the payments, and agreed to indemnify the taxpayer should the taxpayer ever become liable on the debt. *See id.* We held that the effect of these two clauses was to protect the taxpayer against loss through "other similar arrangements" under 26 U.S.C. § 465(b)(4).

However, guarantees are express section 465(b)(4) protections, and the "economic reality" is that the FSC guarantees protected Whitmire from loss. There is no real difference between reimbursement after loss and loss prevention. Further, the list of section 465(b)(4) examples found in the legislative history " 'does not constitute an exhaustive list of such arrangements.' " *American Prin-*

*cipals*, 904 F.2d at 483 (quoting *Melvin v. Commissioner*, 894 F.2d 1072, 1074–75 (9th Cir.1990)). Finally, circular transactions and their various agreements have often been considered as a whole in evaluating loss-protections under section 465(b)(4). *See American Principals*, 904 F.2d at 483; *Waters*, 978 F.2d at 1316–17; *Young*, 926 F.2d at 1088; *Moser*, 914 F.2d at 1049.

To show himself "at risk," Whitmire must make arguments much more strained and far-reaching than did the taxpayer in *Casebeer*. In *Casebeer*, the taxpayer was three hypothetical defaults of one party away from risk; Whitmire's risk relies on a far greater number of contingencies. Further, while the interdependency of payments and relations among the parties may close the stretch of Whitmire's argument somewhat, the *Casebeer* loss protections essentially consisted of a promisor guaranteeing its own promise. Therefore, because this Court held that the *Casebeer* taxpayer was sheltered by section 465(b)(4) protections, Whitmire, by analogy, also crosses into the section 465(b)(4) exception.

Thus, we find that both under the spirit of the section 465(b)(4) exception, and by analogy to *Casebeer*, Whitmire's risk is too remote to constitute a "realistic possibility" of loss.

### 4. Circular Transactions and the "Wait and See" Assumption

While we have set forth the reasons for our decision, we also wish to make clear that two factors did not persuade us to conclude that Whitmire was protected against loss within the meaning of section 465(b)(4).

First, we do not base our decision on the fact that Whitmire's claimed risk resulted from his investment in a circular transaction. Many of the cases in which taxpayers were found not to be "at risk" involved circular sale-leaseback schemes, thus raising a question as to whether circular schemes inherently constitute "arrangements" protecting against loss within the meaning of 26 U.S.C. § 465(b)(4). The Ninth, Second, Eighth, and Eleventh circuits have each found that the offsetting payment structure in a true circular transaction meant that a default by one party would lead each of the others to default in turn, thus making it unlikely that any of the parties within the circular transaction, even those with recourse rights,[5] would disrupt the payment chains in operation. *See American Principals*, 904 F.2d at 483; *Young*, 926 F.2d at 1088; *Moser*, 914 F.2d at 1049; *Waters*, 978 F.2d at 1316–17.

While Whitmire's scheme to protect himself from loss yet remain "at risk" for purposes of deduction failed, his elaborate plan did manage to create a circular transaction that was distinguishable from those in the cases described above. There, chains of loans included one or more *non-recourse* debt links between taxpayers and creditors outside the circular transaction; should a party default, a nonrecourse loan in the chain would have prevented an outside creditor from reaching a personal obligation on the taxpayer's part. Where, as here, a chain of recourse notes can be established between the taxpayer and a creditor outside the circular transaction, the outside creditor has no disincentive to calling a loan. Therefore, unlike the cases described above, Whitmire's circular transaction did not protect him from loss.

Further, in finding that Whitmire is not at risk, we do not rely on the "wait and see" approach this Court has referred to in evaluating taxpayers' "at risk" status. *See American Principals*, 904 F.2d at 483 (noting that a required showing of risk did not harm taxpayers because they could take deductions suspended under this section at a later time, when risk arose or loss occurred). As Whitmire pointed out, this line of reasoning could force considerable delays in claiming deductions—for example, the F/S Lease spanned a period of nine years. In light of the three year statute of limitations for tax assessments given by the IRS, we think it unfair to require a taxpayer to delay deductions, *see* 26 U.S.C. § 6501 (1994), and would permit a taxpayer to take deductions when a "realistic possibility" of risk exists. However,

---

**5.** In *American Principals,* although the taxpayers were personally liable on a recourse note, the only holders of recourse notes were members of the circular transaction. *See* 904 F.2d at 479.

as discussed *supra*, that "realistic possibility" does not exist in this case.

Despite these considerations, we uphold the tax court's decision. Although we find that the circular transaction did not affect the degree of Whitmire's risk, and we question the merits of the "wait and see" approach described in *American Principals*, the existence of the FSC guarantees and theoretical nature of Whitmire's scenario for risk convince us that Whitmire was not at risk within the meaning of 26 U.S.C. § 465.

## IV

In his attempt to remain entitled to deductions for "at risk" amounts, yet simultaneously limit his risk, Whitmire crossed the line into the section 465(b)(4) exception by shrouding himself in too much protection to leave any "realistic possibility" that he would suffer a loss. The existence of guarantees eliminated any risk for Whitmire, under both a plain meaning analysis and a consideration of their effects. Further, the number of assumptions required to foresee any loss on Whitmire's part jettisons him into the realm of "theoretical possibility." Therefore, we affirm the order of the tax court, and hold that Whitmire was not "at risk" within the meaning of 26 U.S.C. § 465.

**AFFIRMED.**